## THE CHARLES SIMONS SONS COMPANY *vs.* THE MARYLAND TELEPHONE AND TELEGRAPH COMPANY.

*Ordinance Prescribing Rates to be Charged by Telephone Company as Condition of Grant of Franchise—Contract Between Telephone Company and Municipality not Governed by General Statute as to Telephone Companies—Right of Citizen to Enforce Rates Prescribed by Ordinance—Meaning of word Telephone in Ordinance Not Determined on Demurrer to Bill—Multifariousness.*

When a municipality has the power to regulate the use of its streets by public service corporations such as a Telephone Company, it has the right to require the company to agree to furnish service to the public at a specified rate, as a condition of the grant of the right to use its streets.

When a Telephone Company has accepted the ordinance and agreed to furnish the service at the rate therein mentioned, it cannot afterwards be heard to say that the rate was not reasonable.

A citizen of the municipality has the right to institute suit against a Telephone Company to enforce its duty to comply with its contract under the ordinance regulating the rates to be charged.

Although there be in force a general law prescribing the maximum rates to be charged by Telephone Companies in the State, yet, a municipality, authorized to regulate the use of its streets, may require a Telephone Company to furnish the service for a less rate than the statutory one, as a condition of the grant of the right to use the streets for its wires, and if the company accepts the ordinance with the condition .a contract is made between the company and the municipality, for the benefit of the public, which is enforceable at the instance of the latter.

In 1896 the defendant Telephone Company was authortzed by an ordinance of the Mayor and City Council of Baltimore to use the streets of the city and certain conduits for its wires, upon the express condition that the price to be charged by the company should not be more than $4 per month for telephones furnished to business offices and not more than $3. per month for telephones furnished at dwelling houses, within the corporate limits of the city. The company formally accepted the terms of the ordinance. Plaintiffs in this case allege that prior to 1903, they had contracts with the company for telephone service with the metallic circuit for the price mentioned in the ordinance; that the company now demands $72 a year for that service and threatens to remove the instruments from their places of business, unless this rate, in excess of that prescribed by the ordinance, is paid. The bill asked for an injunction to restrain this threatened action. The defendant demurred to the bill on various grounds, among others, that by the true construction of the ordinance it is not obliged to furnish ·service of the kind mentioned in the bill at the rate claimed by the plaintiffs. The Acts of 1892, ch. 387 and 1894, ch. 207, prescribed the maximum rates to be charged for the use of telephones and defined what the word telephone, as therein used, should be construed to include. This definition applied to what is known as the grounded circuit service, but authorized other contracts for special forms of service. *Held*, that assuming that the Act of 1892 refers only to the grounded service, that statute does not require the ordinance to be construed as referring only to that kind of service, and it did not prevent the defendant company from agreeing to furnish a better telephone service for a rate less than the maximum rate allowed by the statute.

The kind of telephone service the defendant company agreed, under the ordinance, to supply, at the rate there mentioned, is to be ascertained, not by a reference to the Act of 1892, but from the contract itself, and the circumstances under which it was made. The ordinance uses the word telephone generally, without specifying any particular kind of service. The natural construction to be given to the word is the telephone with all improvements essential to make it most effect.

In this case the defendant contended in support of its demurrer, that under the ordinance it is bound to furnish only the grounded service and the plaintiffs contend that they are entitled to the metallic circuit. *Held*, that since there is nothing n the case to show the difference between these two kinds of service and nothing to enable the Court to say whether it is more probable that one or the other was contemplated at the time the contract was made, this question cannot be determined upon the demurrer, but the facts must be brought to the knowledge of the Court by evidence before a decision can be made.

Under its charter the city of Baltimore has full power to regulate the use of its streets by telephone wires and the condition in the said ordinance, regulating the rates to be charged by the defendant company for the use of telephones, was fully within this power. The ordinance, in this respect, was not a legislative regulation of a corporation, but a voluntary contract by the corporation with the city.

A bill to enforce the obligation of a telephone company to furnish the service at the rate prescribed by an ordinance is not made multifarious by the fact that the plaintiffs have different contracts with the company, since they have a common interest in requiring the defendant to perform its duty.

Appeal from a decree of the Circuit Court of Baltimore City (SHARP, J.), sustaining a demurrer to the bill of complaint and dismissing the same.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, PEARCE and JONES, JJ.

*W. Irvine Cross* and *John Stonewall J. Healey* (with whom were *Joseph C. Judge, M. A. McCormick, John K. Cowen* and *J. Walter Lord* on the brief ), for the appellants.

1. The appellee is estopped to raise the defence that as a legislative attempt to regulate its rates the ordinance of 1896 was *ultra vires*. The ordinance in question does not merely prescribe the maximum rates to be charged by the Telephone Company. It also grants to it valuable privileges. These benefits it has retained and enjoyed, for which reason it is now estopped to assert that the city had no power to legislate in regard to its rates. A party who has received any benefits from a *contract* with a municipal corporation, cannot question its power to enter into the same, although it did not have such

power. *Smith on Municipal Corporations*, sec. 666; *Mayor, &c.,* v. *Harrison,* 30 N. J. Law, 73; *MacDonald* v. *Mayor, &c.,* 68 N. Y. 23; *Middleton* v. *The State,* 120 Ind. 166; *Hendersonville* v. *Price,* 96 N. Y. 423; *Burlington* v. *Gilbert,* 31 Ia. 356; *Mayor* v. *Sonneborn,* 113 N. Y. 423; *Commonwealth* v. *Wolbert,* 6 Binney, 292; *Postmaster Gen'l.* v. *Rice,* Gilpin, 554; *Ryan* v. *Martin,* 91 N. C. 464.

In *Daniels* v. *Tierney,* 102 U. S. 415, the Court applied the general principle to the case of an ordinance passed by the State of Virginia, which the State had no power to pass because it was in violation of the United States Constitution. The Court held that one who had received benefits under the ordinance was estopped to set up its unconstitutionality. To the same effect are: *Ferguson* v. *Lendrone,* 5 Bush (Ky.), 230; *Van Hook* v. *Whitlock,* 26 Wendell, 43; *Lee* v. *Tollitson,* 24 Wendell, 357; *People* v. *Murray,* 5 Hill, 468; *R. R. Co.* v. *Stewart,* 39 Ia. 267.

2. Regarding the ordinance as a mere contract, the appellants are nevertheless the proper parties to bring suit to enforce the appellee's obligations respecting rates. By the rules of construction the preamble and sec. 4 must be taken together, and the evident purpose of the ordinance was therefore to give to the citizens of Baltimore who might desire to subscribe to its use, a telephone service at much lower rates than those then charged by the C. & P. Co., and presumably equal in service to that provided by the latter company. The ordinance therefore was granted for a consideration moving at the time of such grant, viz., the service to be rendered to the citizens of Baltimore at a certain fixed rate, thus making them, the subscribers, *the beneficiaries.*

The ordinance was not under seal, and by the decisions in this Court a contract or obligation not under seal is suable upon by the beneficiary or beneficiaries: *Seigman* v. *Hoffacker,* 57 Md. 321; *Owings* v. *Owings,* 1 H. & G., 484; *Small* v. *Schaefer,* 24 Md. 143.

In this case the promisor accepting the ordinance bound itself to benefit an indefinite number of persons viz., those persons who

might subscribe to its service not unknown persons nor mere vol·
unteers, but known to the contracting parties as citizens of Bal-
timore.  This was not a condition subsequent in the sense used
by the defendant, but a condition springing into existence and
capable of being taken advantage of immediately upon the
passage of the ordinance and the establishment of its plant by ·
the Telephone Company.   The reasoning in the Maryland
cases above referred to and the language of other authorities
therein quoted clearly refute the view that there must be a
duty from the promisee to the beneficiary or a relationship be-
tween them to establish the privity.

The case of *Hand* v. *The Marble Co.*, 88 Md. 229, relied
on by the appellees' counsel, is in no way contrary to our con-
tention.   There was no question in that case of beneficiary,,
but of privity, where the assignment of the contract had been
made by one party to a third party, without the knowledge or
consent of the other party to their contract.   In the case now
before the Court, there was full knowledge by both parties of
the beneficiaries, and the privity was fully acknowledged and
established at the time of the execution of the contract.  Fur-
thermore, as showing that the doctrine of the Hand case has
no application to the present case we would refer the Court to
its decision in the later case of *Eastern Advertising Co.* v.
*McGaw*, 89 Md. 72.   That case is similar in all respects to
the Hand case, and this Court, quoting very fully from its
opinion in the latter case, rests its decision on the ground that
the *delectus personæ* being material in the contract, it could not
be assigned without the consent of the other party to it.

In the Water Company cases referred to by the appellee as
supporting its contention that the subscriber is not a benefi-
ciary under the contract and has therefore no right to sue, the
facts are different, and the distinctions are very clearly de-
,fined in the opinions.

But plaintiffs' right to sue can be also supported on the
ground that they are more than mere beneficiaries.

(*b*) *The contract was entered into by the Mayor and City
Council, as agents of the citizens of Baltimore, and the appellants
as citizens can sue thereon.*

This theory of agency is the one that has been adopted in several cases to sustain the right of a citizen to bring suit to enforce the obligations of a public service corporation under an ordinance similar to the one in the present case.

In *Adams v. Union R. R. Co.*, 21 R. I. 134, a street railway company, having power under its charter to charge *ten cents*, accepted an ordinance from the town of East Providence granting it a franchise between certain points in the town and providing that the company should not charge more than five cents between those points.    Plaintiff, a passenger, brought a suit based on this provision of the ordinance.    On the question as to the right of the plaintiff to sue, the Court refers to the so-called *beneficiary rule* in contracts, but does *not* rest its decision on that ground, saying: "The contract in question was made for the benefit of passengers using the defendant's cars.    The town can hardly show damages for its breach, and, therefore, if the people for whose benefit it was made cannot recover for its breach, no one can.    True, the town might take steps to avoid the contract and stop the road, for failure to perform conditions, but in so doing it would cut off the privileges of many to redress the wrong of one.    This would neither be a reasonable nor an adequate remedy.    It must have been intended to be a contract for *the benefit of the public*, made through the town as *their corporate representative*, upon which passengers could rely, and for breach of which they could seek redress.    Otherwise it is a contract of little obligation and force."

The same principle was adopted in *Cortelyou v. Staten Island M. R. Co.* and *Gaedke v. Same*, 43 App. Div. (N. Y.), 514.

3. The proper view to take of the ordinance is not that it is a mere contract, nor a legislative attempt to regulate rates.    It is a contract of a public nature, entered into by the city by virtue and in pursuance of a sovereign power delegated to it by the State, with a public service corporation; and the duties thereby imposed upon the latter, respecting rates for service, are not mere private obligations to the Mayor and City Coun-

cil as a corporate entity, but duties to the public which any individual member of the public interested therein has a right to enforce.

The authorities draw a clear and well defined distinction between those contracts entered into by a municipal corporation in the character of a property holder or in respect of its business administration, and those entered into for public purposes.    In *State ex Rel.* v. *Mad. St. Ry. Co.*, 72 Wis. 612, the Court drew this distinction.    Speaking of an ordinance granting the privilege to a Street Railway Co. to use the city streets, and in answer to the contention of the company's counsel, that it conferred no franchises, but was a mere contract between the company and the city, the Court said :" The acceptance by the company of these conditions of the ordinance constitutes a contract, without doubt, and so does the acceptance of a legislative charter by the incorporators; but it is clearly something more and above a mere contract."

See also *Hayes* v. *The Michigan Central R. R. Co.*, 111 U. S. 228; *Lake Roland R. Co.* v. *Baltimore*, 77 Md. 352.

The State having sovereign power over all the streets and highways throughout its territory, but having delegated this authority to the city, the act of the city in pursuance thereof was an act on behalf of the State for the benefit of the public, and it is therefore in all respects impressed with the character of a sovereign act.    The State could have granted to the company the franchises and privileges of Ordinance 110, and attached as conditions to the grant the obligations in regard to maximum rates; in which case these obligations could be enforced at the suit of the appellants here, because it would have been a legislative act.    Does it make any difference that the city conferred these franchises acting under the power delegated to it by the State and *pro hac vice* as the representative of the sovereign ?    We think not.    The franchise so conferred was essential to the prosecution by the defendant of its corporate objects as a quasi-public corporation.    It makes no difference, then, in the matter of such an enabling Act, whether it be passed by the State or by the city as the agent of the State.    In either case

it is a public Act, and the obligations thereby imposed become not mere contract obligations, but duties to the public. *People* v. *Suburban R. Co.*, 178 Ill. 594; *Rice* v. *Detroit R. Co.*, 122 Mich. 677. In *Westfield Gas Co.* v. *Mendenhall*, 142 Indiana, 538, the Court adopts the same view of a similar ordinance and applies the same line of reasoning. In that case the defendant, a Gas Company, having accepted a franchise from the town of Westfield to lay pipes in its streets on condition that it would not charge more than a certain rate, a Court of equity on the application of an individual citizen enjoined the company from charging more than the ordinance rates.

When illegal acts affect the public, public officers must institute proceeding, but when only a part is affected, the individual so affected, may do so. *Dillon on Municipal Corporations*, secs. 732, 733; quoting *Baltimore* v. *Gill*, 31 Md. 375. See also *St. Mary's Industrial School* v. *Brown*, 45 Md. 326.

In the case at bar only a *special class* of the general public of Baltimore are damaged by the particular violation of the ordinance complained of; and this *special class* consists of that portion of the general public who have already or who may desire to avail themselves of the telephone service of the appellee. The principle of the case just cited, therefore, applies with full force to the present case, and there can be no doubt as to the right of the appellants and those similarly situated as composing this special class, to bring this suit. The city could not bring suit to enforce the obligations of sec. 4, as it would involve the expenditure of public funds to benefit the few and not the public at large. *Mealey* v. *Hagerstown*, 92 Md. 741.

*Kind of Service.*—The service as prayed for in the bill is *telephones and telephone service such as appellants now have, which consists of a telephone service for a business connection over a copper wire, with metalic circuit, and long distance transmitter, operated by means of a central energy system, with such essential improvements as are warranted by experience, invention and normal progress in the art of telephony.*

Counsel for appelle contend that its only obligation under the ordinance is to furnish what they designate as a statutory telephone service, viz., the kind that was in use by the C. & P. Tel. Co. on April 10th, 1894, and known as the "grounded circuit service."

Certain important facts presented in this case, are as follows:

1. The metallic circuit service, though not in general use, was nevertheless known and recognized in 1894. Acts of 1894, ch. 207; Code, Art. 23, sec, 232G.

2. The Ordinance 110 was passed in 1896.

3. In the intervening two years the grounded circuit service had been virtually superseded for commercial purposes by the metallic circuit service now in vogue, which fact is established by the following facts, viz:

(*a*) On December 1st, 1895, the C. & P. Telephone Co. was furnishing the metallic circuit service which the Home Telephone Company (the predecessor of appellee) proposed to furnish to residents of the city at the rate subsequently prescribed by the ordinance.

(*b*) The appellee has never used the grounded circuit service, having commenced its operations under the ordinance by installing and supplying the metallic service, which it has since continued to furnish.

4. There is no difference in character between the appellee's service in 1896 and the service for which it now attempts to charge an increared rate; the only difference being in the application to its service of the normal progress of the art of telephony, which, while probably rendering the service more efficient, has on the other hand contributed to reduce rather than increase the cost of operation.

The word telephone as used in the ordinance means the metallic circuit service which was in use at the time of its passage and which had virtually superseded the grounded service. *Central Tel. Co.* v. *Bradbury*, 106 Ind. 1; *Chicago Tel. Co.* v. *Mfg. Assn.*, 106 Ill. App. 69.

The Act of 1892 ch. 387, in express terms restricts the defi-

nition of the word telephone to the Act itself. The Legislature emphasizes this limitation by using the language, "The word 'telephone,' wherever used *in this Act* shall be construed, &c. ," and on the principle of *Expressio unius est exclusio alterius* it can only have application to the Act alone.

But even apart from these limitations in express terms, it is plain that the legislation in question has no logical connection with the ordinance, and was never designed to affect such an arrangement with the city. It was intended merely as a State regulation of telephone companies, and to establish their relation and duties to the State itself in the light of the conditions and in respect to the point to which the art of telephony had progressed at the time (1894). The C. & P. Tel. Co. was the only company then in operation in the State; and the grounded circuit s was still used commercially, although the metallic circuit service was also in operation. During the next two years the grounded circuit was superseded by the metallic circuit. Such was the condition in the progress of the art when the ordinance was passed in 1896.

The only logical inference would be that the parties entered into this arrangement with reference to these changed conditions, and not with reference to legislation growing out of conditions which were both temporary and obsolete.

That the framers of the ordinance did not use the word "telephone" in its so-called statutory sense, is conclusively established by the express terms of the ordinance, as well as by an interpretation of its language with reference to its purpose, the external circumstances and the acts of the appellee.

The Courts have adopted the following rules for the construction of ordinances :

(*a*) Ordinances are construed by the same rules as statutes. *State* v. *Kirkley*, 29 Md. 85, 103; *Balto.* v. *Howard*, 6 H. & J. 382; *Balto.* v. *Clunet*, 23 Md. 468; *In re Yick Wo*, 68 Cal. 294; s. c., 58 Am. Rep. 12; *Zorger* v. *City of Greensborough*, 60 Ind. 1.

(*b*) The Court will consider the external circumstances existing at the date of its passage, and also preamble. *Balto. City* v. *C. & P. Tel. Co.*, 92 Md. 692, 698.

(*c*) To ascertain its purpose and give effect thereto, Courts will consider the cause and necessity of its passage. *Commonwealth* v. *Dow,* 10 Metcalf, 382; *Smith on Municipal Corporations,* sec. 540, and cases cited; *Dillon on Municipal Corporations,* sec. 420.

(*d*) In doubtful cases the Courts will consider the acts of the parties. *State* v. *Severence,* 49 Mo. 401, 404; *Chicago* v. *Seldon,* 9 Wall. 50, 54; *Hanna* v. *San Francisco,* 17 Fed. 119; *Mulford* v. *Le Franc,* 25 Calif. 108, 110; *Stenbach* v. *Stewart,* 11 Wall. 576.

(*e*) Courts will adopt a construction which will preserve its validity and *effectiveness. Dillon on Municipal Corporations,* sec. 420; *Smith on Municipal Corporations,* sec. 540, and cases cited. 17 *Am. & Eng. Ency. of Law,* 2 ed., p. 18, and cases cited.

(*f*) Acts granting special franchises to individuals are to be construed liberally in favor of the public and strictly as against the grantee. *Cooley on Constitutional Limitations,* p. 487, and cases cited; *Bradley* v. *R. R. Co.,* 21 Conn. 294, 306; *Balto.* v. *B. & O. R. R. Co.,* 21 Md. 50; *Johnson* v. *Phila.,* 60 Pa. St. 445.

Applying these rules to the ordinance in question, removes all doubt as to its true meaning, and enables us to give effect to what would otherwise be an utterly frivolous ordinance.

We submit that we have conclusively established the following propositions:

(1) That the word "telephone" is a generic term, used to describe the equipment and service as an entirety, and when used in an Act or ordinance it contemplates the best grade of service in use for commercial purposes.

(2) That the Legislature of this State has never defined the word "telephone" to mean simply a grounded service circuit.

(3) That any definition the Legislature may have given to the word "telephone" is in express words and by clear implication restricted in its operation to the Acts of 1892 and 1894.

(4) That there is no logical connection between the said Acts and the Ordinance of 1896, so as to make any definition

in the Acts control the meaning of the word telephone in the ordinance.

(5) That it is plain, from the preamble of the ordinance and the external circumstances existing at the time of its passage, that it was not the intention of the parties to use the word "telephone" therein to designate simply a grounded circuit service.

(6) That to so construe the word would not only defeat the evident purpose of the ordinance as expressed in its preamble, but would nullify the effect of the provision in sec. 4 designed to prevent a consolidation, and would make the provision respecting rates utterly frivolous from the time of its passage.

(7) That appellee has by its acts recognized that it was obligated under the ordinance to furnish a metallic circuit service at the rates therein prescribed; and that if it did not understand its obligations to be such, its conduct during the past six years of operation under the ordinance amounts to a gross fraud on the general public.

(8) That the ordinance must be construed liberally in favor of appellants and strictly as against appellee.

*Edgar H. Gans* and *William L. Marbury* (with whom was *Stuart S. Janney* on the brief), for the appellee.

The bill is multifarious. It embraces different persons as plaintiffs, who have no privity with each other. The various subscribers to the Maryland Telephone Company's service, each holding under a separate contract with the company, can by no possible construction be said to be in privity.

In no case, has a bill been sustained when brought by several independent persons, whose only relations to the defendant are fixed by individual contracts absolutely separate and distinct in each case where there is no subject-matter in which all have a proprietary interest, and where the only thing in common between them is an interest not in the subject-matter, but solely in one of the legal questions involved in the suit. As well might it be said that all the insured holding certain policies in a company, could join in a bill in equity to have a decree declaring against the company's contention that the

policies are not binding.  Indeed, it is hard to imagine a case of any importance where the principles involved are not of equal interest to many others similarly situated, and often so towards the same defendant; yet it has never before been suggested that such an interest in the legal proposition gave a right to join in one bill.  *Miller* v. *Marble Co.*, 52 Md. 642; *Hamilton* v. *Whitridge*, 11 Md. 128; *Brehm* v. *Sperry*, 92 Md. 402; *Marselis* v. *Canal Co.*, 1 N. J. Eq. 31; *Yeaton* v. *Lenox*, 8 Peters, 123.

A bill was filed by six firms to enjoin the collection of an alleged illegal tax, on behalf of themselves and all others similarly situated.  *Held*, multifarious.  The only matter in common among the plaintiffs or between them and the defendant is an interest in the question involved.  Scarcely a suit is decided that does not involve a question in which other parties are interested.  *Cutting* v. *Gilbert*, 5 Blatchf. 261.  An author cannot file one bill against several book sellers for selling the same spurious edition of his work.  There is no privity between them, and his right against each is distinct.  *Dilly* v. *Daig*, 2 Ves. Jr., 486; *Story, Eq. Pl.*, sec. 277.  Persons who have been separately indicted for sales of liquor in original packages cannot unite in the same bill to enjoin further prosecution, although they are agents and sub-agents of the same importer.  *Woolstein* v. *Welsh*, 42 Fed. 566.  Different property owners cannot join in a bill for injunction to restrain city from raising level of a bridge, on the ground of irreparable injury to their property.  *Plum* v. *Morris Canal Company*, 10 N. J. Eq. 256.  Holders of script or shares in a loan cannot file a bill on behalf of themselves and other holders, to have their subscriptions returned for fraud.  The demands are distinct and separate, though the fraud alleged in each case was identical.  *Jones* v. *Del. Rio*, Tur. & Russ. 297.

*The Plaintiffs Have No Standing In Court.*  The Mayor and City Council of Baltimore have never been delegated by the State the power to regulate the compensation to be paid public service corporations for their services.  Either the charter existing at the time of the passage of Ordinance No. 110,

nor that existing at present, contains any provision which, by any possible construction could authorize such action. It is too well established for question that this power is a legislative function, and cannot be exercised by a municipality without express legislative authority. *Louisville Gas Co.* v. *State*, 21 L. R. A. 734, 135 Ind. 49; *St. Louis* v. *Bell Tel. Co.*, 2 L. R. A. 278; *Barber Co.* v. *Harrisburg*, 29 L. R. A. 400; *Wis. Tel. Co.* v. *Shebaggan*, 111 Wis: 23.

This conclusion is vastly fortified in the present instance for the Legislature of Maryland has shown its intention to retain the exclusive power to regulate telephone rates, by actually legislating on the subject itself, as witness the Act of 1892, ch. 387, and the Act of 1894, ch. 207, which two Acts finally fix the maximum rate lawful to be charged by a telephone company for telephone service within the State. These Acts were in force at the date of the passage of Ordinance No. 110, which consequently could not have been a *regulation.* The rate sought to be charged being less than that fixed in the Act of 1894, cannot, in the nature of things, be an *illegal* rate, and if the conditions embodied in the ordinance are valid at all they are not so, as regulations by the Mayor and City Council in its lawmaking capacity. The ordinance does not originate in the legislative function of the municipal government, but in its power to contract. The municipality may enter into contracts just as any other corporate body may do so with respect to matters germane to its corporate objects; and grants of the municipality resting in contract are subject to the same rules of construction and the same rights repose in the parties thereto, as in the case of private citizens and the same remedies are applicable.

That such ordinances when accepted are governed by the rules regulating contracts is abundantly established. *Noblesville* v. *Gas Co.*, 157 Ind. 169; *Hayburg* v. *Gas Co.*, 38 Mich. 154–6; *Belleville* v. *City R'wy. Co.*, 152 Ill. 184; *New Orleans* v. *R. R. Co.*, 37 La. Ann. 589–92. This Court so treated the ordinance granting its privileges to the Chesapeake and Potomac Telephone Company. *C. & P. Tel. Co.* v. *M. & C. C.*, 89 Md. 710.

The present ordinance, is, therefore, nothing more than a grant or an executed contract between the two corporations, the Mayor and City Council of Baltimore, and The Maryland Telephone and Telegraph Company of Baltimore City. The grant contains a *condition subsequent* of which these plaintiffs seek to obtain the benefit. They are in no way named in the contract of grant, nor are they parties to it. *The Telephone Company has nowhere agreed or promised to perform the stipulations as to rates. It has accepted the privileges granted in Ordinance No. 110, coupled with the conditions therein named.*

Upon the violation of a condition subsequent the grantor has a right to declare a forfeiture, but that right reposes in him alone, and no one else can take advantage of the breach. *Encyl.*, vol. 6, p. 506; 4 *Kent Com.*, 127; ·3 *Kerr, Real Prop.*, 1885–95–1901; *Cross* v. *Curson*, 8 Blanchf. 138; *B. & D. S. Co.* v. *R. R. Co.*, 67 Fed. 35.

The grantor is not bound by any contractual obligation to avoid the performance of acts which would amount to a forfeiture. A condition is a very different thing from a covenant and a Court of equity will not enjoin its breach or specifically decree its performance. *Woodruff* v. *Water Co.*, 2 Stockton, 507, 10 N. J. Eq. 507.

Even were the words used in the ordinance of doubtful import where the subject-matter of the grant is in its nature executory, consisting of privileges or rights to be enjoyed, an exception to the general rule is recognized and the Courts are inclined to construe doubtful words as creating a condition subsequent, words which in another connection would be held to raise a covenant. *Rawson* v. *School*, 7 Allen, 125–129, cited with approval in 81 Md. 193.

Thus the authorities seem to be clear that the provision in sec. 4 of the ordinance constitutes a condition subsequent, of which the city may take advantage by way of enforcing a forfeiture in the event the condition is violated. *Belleville* v. *Citizens Ry. Co.*, 26 L. R. A. 681; *Pac. Ry. Co.* v. *Leavenworth*, 1 Dillon, 393.

It is clear, therefore, since the city itself could not maintain

a suit for the matters complained of, owing to the absence of any contractual obligation on the part of the company to perform; but is confined to the usual remedy for the breach of a condition, the plaintiffs can certainly have no other or greater rights, and therefore, cannot maintain this suit. ·

If the ordinance be treated as a contract, the plaintiffs cannot sue on it.

"The general rule of law is that a person who is not a party to a simple contract and from whom no· consideration moves cannot sue on the contract, and consequently that a promise made by one person to another for the benefit of a third person who is a stranger to the consideration will not support an action by the latter. And the recent decisions in this commonwealth and in England have tended to uphold the rule and to narrow the exceptions to it." *Exchange Bank* v. *Rice*, 107 Mass. 41; *Morrill* v. *Lane*, 136 Mass. 93; *Bordin* v. *Boardman*, 157 Mass. 410. ·

In *Vroomau* v. *Turner*, 69 N. Y. 283, the Court said: "To give a third party who may desire a benefit from the performance of the promise, an action there must be, *first,* an intent by the promisee to secure some benefit to the third party; and *second, some obligation or duty owing from the former to the latter which would give him a legal or equitable claim to the benefit of the promise or an equivalent from him personally.*"

This principle has since been approved in *Constable* v. *U. S. S. Co.*, 154 U. S. 51–73–4.

And is supported by the weight of authority in other States. *Baxler* v. *Camp*, 71 Conn. 245–8; *Housman* v. *Trenton Water Co.*, 119 Mo. 304; *Durnherr* v. *Raw*, 135 N. Y. 219; *Davis* v. *Clinton Water Co.*, 54 Ga. 59; *Burton* v. *Larkin*, 36 Mass. 246; *Becker* v. *Water Works*, 79 Ia. 419; *Fowler* v. *Water Co.*, 83 Ga. 219; *Mott* v. *Cherryville Water Co.*, 28 Pac. Rep. 989 (Kas.)

An exhaustive note on the subject will be found in *Jefferson* v. *Asch*, 25 L. R. A. 257. It is there seen that a few Courts depending generally on unguarded expressions in prior cases, seemingly admit a third party to sue on any contract of which

he is beneficiary.    This rule seems to hold in Alabama, Indiana, Illinois, and perhaps, Rhode Island.    *Mason* v. *Hall*, 30 Ala. 279; *Ransdell* v. *Moore*, 153 Ind. 294–405; *Snell* v. *Iwes*, 85 Ill. 279; *Urquehart* v. *Braxton*, 12 R. I. 169–71.

The case of *Small* v. *Schaefer*, 24 Md. 143, has been sometimes cited as an authority for the conclusion that Maryland is one of the slender list of States whose Courts uphold the broad principle that a third party for whose benefit a contract has been made can in all cases found a claim upon its breach. An analysis of the facts of this case show that this conclusion is not justified.

See later Maryland decisions—*Hand* v. *Marble Co.*, 88 Md. 229; *Eastern Adv. Co.* v. *McGaw*, 89 Md. 86.

The broad principle contended for by the complainants has no authority in this State, and the weight of well-reasoned cases is against it.    Indeed, it must be perfectly obvious that to permit any one incidently benefited by a contract to sue thereon would give rise to a multitude of legal obligations, that were never contemplated by the parties to the contract, and would be altogether unreasonable.

*The intent of the parties must be given effect, if that is found to be in favor of creating a legal obligation to the beneficiary, and if there is a duty owing from the promisee to the beneficiary, with respect to the subject-matter of the suit, so as to supply by a sort of substitution the necessary consideration the action will lie, otherwise it will not.*

Now it is apparent that in the present case neither of these elements is present.    The municipality certainly owed no duty to the plaintiffs or to its citizens to procure them cheap telephones.    Such a contention could not be countenanced for a moment.    Nor is it believed to have been the intention of the parties to this contract to create a legal right in favor of the plaintiffs or the class to which they belong.    To so hold might bring about very strange results.    It is a well-settled rule that when a beneficiary of a contract made for his benefit and of such a character that he can sue thereon, assents to the same, it becomes *irrevocable* by the original parties.    *Creager* v.

*Link*, 7 Md. 259–67; *Bassett* v. *Hughes*, 43 Wis. 319; *Note*, 25 L. R. A. 266, sec. XI.

*Is this Court prepared to decide that the Mayor and City Council of Baltimore, with the concurrence of the Telephone Company, could not repeal the ordinance depended on in this suit without the assent of each and every subscriber who has assented to its provision?*

A case frequently occurring, and which is presented by some of the authorities cited above, is that of a Water Works Company which has contracted with a municipality to supply water in certain quantities for the extinguishment of fires. It fails to keep the contract in consequence of which a citizen suffers a severe fire loss and sues the company depending upon its contract with the municipality to support the action. The Courts of the country are practically unanimous in holding that the citizen has no rights under the contract. *The city owes him no legal duty* to supply the water, and he can obtain no benefit from the city's contract with the company. Authorities above cited. *Mott* v. *Cherryville Co.*, 28 Pac. Rep. 989, *Davis* v. *Clinton Co.*, 54 Ia. 59; *Eaton* v. *Fairbanks Co.*, 56 N. W. Rep. 201; *Hanson* v. *Water Co.*, 23 L. R. A. 146–7, where all the cases are collected. The Supreme Court of Texas has decided that in a situation such as is contended for by the plaintiffs in this suit the citizen has no right to sue. *Clepburn* v. *Clepburn Water Co.*, 35 S. W. Rep. 753.

In addition to the foregoing, there is a very evident question of public policy involved. The public officials who direct the policy of the municipal government are accustomed to look at such a question as is here presented from all sides. They may have reason for believing it best for the public welfare to waive a strict right which they may have under the contract. They may think it altogether advantageous that the Telephone Company should have the right to raise its rates. They may have reason to believe that an insistance on a literal compliance with the rates named in Ordinance No. 110 would result in wrecking the Telephone Company, and knowing such a result would be detrimental to the public wel-

fare, they may deliberately determine not to enforce the contract. Is it compatible with public policy that a handfull of citizens looking to their own interest in the matter should be able to balk them in this course?. If the right of these plaintiffs to maintain this suit were sustained, it would put it in the power of any or every mercenary citizen, or even of a business competitor to direct the municipality in the policy it must adopt in such cases, and would leave nothing to the discretion of the officials who are installed as responsible heads and sworn to a faithful performance of their duties. The situation is analogous to that of minority stockholders who endeavored by a bill in equity to force the directors to adopt or abandon a certain policy or to enforce certain contracts. The Courts invariably hold in such cases that this is a matter for the directors to determine, and if the stockholders are dissatisfied, they should elect a new board. *Shaw* v. *Davis*, 78 Md. 308.

Again, it is evident that this ordinance is not for the *sole* benefit of the subscribers, as under it the city gets a rental for the subways and a reduced rate for itself. This fact alone is a complete answer to a plaintiff's claim to rights under a contract to which he is not a party, even when the agreement falls within one of the well-recognized exceptions.

*The right to enforce the contract cannot reside both in the promisee and in the beneficiary.* The promisor would be liable to two separate actions founded on the same breach. *Bank* v. *Grand Lodge*, 98 U. S. 124–125.

From 1894 there were two kinds of telephone service and equipment known in Maryland and in general use : (*a*) The ordinary service, or grounded service always understood when the word telephone was used simply; and, (*b*) the special forms, descriptions and amount of telephone equipment and service, for which special rates could be charged by written contract specifying the service, and all of which had as one of their elements *the metallic circuit,* and this was the condition of things obviously in 1896.

This Ordinance No. 110 is claimed by the plaintiffs to be

a contract, and must therefore be construed by the ordinary rules governing the construction of contracts.

One rule is expressed. in *Brown* v. *Smart*, 69 Md. 320, as follows: *"The law existing at the time and place of making a contract enter into and form a part of it as if they were expressly referred to, and this rule embraces alike those which affect its validity, construction, discharge and enforcement."* Again— "In ascertaining the meaning of words in a deed or other written instrument, technical words must be given their technical meaning." *Md. Coal Co.* v. *Cumb. & Penna. R. R. Co.*, 41 Md. 343.

It is clear, that there is nothing on the face of this contract describing the thing to be furnished, but the terms "telephone" and "telephone service." And now the whole question is—what is meant by the word telephone in view of the circumstances?

The defendant was not supplying telephones in 1896. The only company then which had a franchise was the Chesapeake and Potomac Telephone Company, who were furnishing two kinds of service, the ordinary or grounded service and the metallic circuit service, the one for the statutory rate, the other under special contract for a higher price.

The plaintiffs contend that the word telephone in the ordinance means not the ordinary telephone especially designated by law by that name, but the best and most modern telephone with all its improvements. . This construction, we submit, is unreasonable and contrary to all the rules governing the construction of contracts. The business of fixing rates of telephone companies belongs to the Legislature, not to the city. When, therefore, the city passes an ordinance concerning telephone rates it, of course, intends its language to be construed by the meaning given to similar words by the Legislature. The ordinance is subject to the legislative Act, and to be construed in the light of its policy.

Now, by the Act of 1894, the legislative policy was to fix a definite rate for a definite kind of telephone service; that telephone service meant a particular thing, the full and detailed

description of which was accurately recorded in the office of the clerk of the Court of Appeals.

Therefore, when the ordinance requires telephone service to be furnished for $3 or $4 a month, why does it not mean just what that statute means which regulates the whole subject of telephone service in Maryland? The statute says: You must not charge more than $6.50 a month for telephone service. The statute means by this—telephone service of a definite, described kind, whose description is available in any Court of law. If in legal contemplation, "telephone service" means telephone service of a definite kind, if the word telephone has become in Maryland a technical word legally defined; then undoubtedly this meaning would be attached to the words, if used in any other statute, and *a fortiori* if used in an ordinance which is valid only as interpreted in the light of the policy of the law as fixed either by statute or the common law. The statute recognizes the fact that telephones can be improved, that services can be radically changed, that new inventions and appliances may be discovered, with respect to which it would be *unreasonable* to fix a definite rate. The definite rate might be reasonable for the known telephone then in use, but be very unreasonable as applied to a newly improved and costly instrument.

This Act of 1894, controls the question. But *independent of this Act*, on reason, this construction of the ordinance is correct.

1. Rates of fares that may be charged by corporations having *quasi* public duties may be fixed by the Legislature, but even the Legislature is restricted in this power. If the rates fixed are unreasonable, then the matter becomes a judicial question, and the unreasonable rate may be declared void by the Courts. Now it is evident that this judicial question can be determined only when a certain definite kind of service is adjudicated upon. It would be beyond the power of any Court to decide whether an existing rate would be reasonable when applied to an unknown, improved and costly service which the future might bring forth in the improvement of the art.

162    SIMONS SONS CO. vs. MD. TEL. CO.

Opinion of the Court.                    [99

2. This method of construction has been followed by the Supreme Court of the United States. The case of *Chesapeake & Potomac Telephone Company* v. *Manning*, 186 U. S. 238, is not quoted as being an authority on the facts. That is, the facts are not at all like the facts in this case. But it is quoted for the principle of construction which we are now contending for.

JONES, J., delivered the opinion of the Court.

This suit was instituted in the Court below by the appellants against the appellee corporation for an injunction, upon the allegations and for the purposes set out in their bill of complaint. The appellee demurred to the bill, thus admitting the truth of the facts therein alleged as far as the same are well pleaded. The Court below sustained the demurrer and dismissed the bill. This action of that Court is before us for review upon this appeal.

The facts with which we will be concerned in the inquiry we are to make, as they are made to appear from the record of proceedings before us, are as follows : The appellee is a corporation formed and organized under the general incorporation laws of the State. The original Act of incorporation was obtained in January, 1890. This provided that the name of the corporation should be, "The Writing Telegraph Company of Baltimore City" and stated the object thereof to be the constructing, owning, and operating telegraph lines in the State * * * the transaction of a general telegraph business * * * and "the transaction of any business in which electricity, over or through wires may be applied to any useful purpose." By an amendment to the charter in July, 1895, the name of the corporation was changed to "Home Telephone and Telegraph Company of Baltimore City;" and by a further amendment in May, 1899, the name was changed to that by which the corporation is sued in the present proceeding "Maryland Telephone and Telegraph Company of Baltimore City;" and the object of the corporation as respects the operation of a telephone system was more specifically stated.

Prior to the last amendment and under the name "Home Telephone and Telegraph Company of Baltimore City," the corporation applied to the city of Baltimore for permission to construct and maintain its "lines of wire and electrical conductors under, upon or over the public streets, alleys, conduits and other public places" of the city in order to transact and carry on its telephone business therein. On the 1st of July, 1896, the city of Baltimore by Ordinance No. 110 granted this permission. The ordinance is styled, "An ordinance granting permission to the Home Telephone and Telegraph Company of Baltimore City to use for its telephone wires the ducts in the conduits of the police and fire alarm telegraph system, not needed for the city's use, and authorizing said company to extend its system in the territory not covered by the said police and fire alarm telegraph conduits, subject to certain conditions and restrictions, and authorizing the Mayor to rent all space in said conduits not promptly occupied by said the Telephone Company to such other persons or corporations as may desire to use the same." Following this is a preamble which recites that "the telephone has become almost a necessity of modern life in cities ; " that "there is very great need of a cheaper telephone service in Baltimore City, the number of telephones being very small in proportion to the population on account of the very high prices demanded by the company which now has a monopoly of the telephone business here ; " that such company had given official notice to the public through the report of the Telephone Commission to the General Assembly on January 6th, 1896, that "it will not and cannot reduce its rates for telephone service; " that "at the present rates the telephone, although greatly needed in business, is beyond the reach of persons of ordinary means, and the use of it is confined to a favored few, who have the means of paying the high prices charged ; " that "it would be a great boon to the persons of moderate means, and a very great advantage to the business community, at large, to have a cheaper telephone service ; " that

"the Home Telephone and Telegraph Company of Baltimore City has declared itself ready and willing to supply such a service at rates very much lower than those now prevailing; " that the subways heretofore constructed by the city of Baltimore for the wires of the police and fire alarm telegraph system of the city are "capable of containing numbers of wires over and above the number of ducts required for the city's use ; " and that these ducts produce no revenue to the city but· can be made. a source of revenue if leased to the Home Telephone Company.

The ordinance then grants permission to said Telephone · Company to· use the ducts, &c., mentioned in its title and pre-amble for the purposes of its business; and prescribes the reg-ulations and conditions under and subject to which such per-mission is granted.    Among these is the following, being sec. 4 of the ordinance, "that the rights and privileges hereby granted are granted subject to the following conditions, namely : " "That the prices to be charged by the said Home Telephone and Telegraph Company of Baltimore City shall not be more than four dollars per month for telephones fur-nished to business offices, and not more than three dollars per month for telephones furnished at dwelling houses within the corporate limit of Baltimore City, and to the further express condition that all the rights and privileges hereby and herein granted shall cease and be forever forfeited, in case the said Home Telephone and Telegraph Company of Baltimore City shall be consolidated with any other telephone company in Baltimore City, unless the terms of the consolidation provide that the consolidated company shall not charge more than the above mentioned rates for the use of its telephones."    It is further provided in the ordinance that the powers therein granted to the telephone company may be forfeited at the option of the city unless the company~shall have, within two years from the date of the same, not less than two thousand telephones in actual use in the city; and that the Telephone Company "shall indicate its acceptance of the terms and con-ditions" of the ordinance "by filing a written acceptance of

the same with the Mayor, and filing at the same time a bond conditioned for a faithful observance of the provisions of" the "ordinance in the penalty of ten thousand dollars," &c.

After the passage of the ordinance, the Telephone Company therein mentioned filed its bond as required thereby and its acceptance of the same, addressed to the Mayor, in the office of the Comptroller of the city. The grant of the use of the subways and ducts of the city for the purposes of the telephone company was made for "the period of ten years and until such time as the city's general subway system is ready for use in the localities now covered by the subways of the police and fire alarm telegraph system;" and subject to a rental to be paid to the city as provided in the ordinance.

The appellants are four in number—all citizens of Baltimore; all having business establishments, and conducting business therein, and all having need for the purposes of business, of the use of some telephone system. They sue for themselves and all others in like situation with themselves, as respects the use of the telephone and their relations to the appellee. It appears, rather inferentially than by direct averment, that all of the appellants had, with the appellee, prior to 1903, contracts for telephone service at the rate named in sec. 4 of the Ordinance 110 under which apparatus and equipments, with what is known as the metallic circuit, had been installed in their several business establishments. The appellee now refuses to furnish the appellants or any of them the telephone service mentioned, at the rates specified in the ordinance; and, it is alleged, is threatening some of them with a discontinuance of service to them and a removal of the telephone instruments and equipments from their places of business unless they agree to pay for said service at the rate of seventy-two dollars per annum; and as to others, has, by such threats, extorted from them contracts, made under protest, to pay for such service at the said rate. The prayer of the bill, in substance, is that the appellee be restrained from the aforesaid threatened action; and from demanding and receiving from the appellants he excess of charge for telephone service, such as is men-

tioned in the bill, over the rate provided in Ordinance No.
110; and that the appellants and others in like situation with
them, as respects the matters in controversy between them
and the appellee, be decreed entitled to demand and receive
from the appellee the kind of telephone service mentioned in
the bill of complaint at the rate of charges provided in said
ordinance.

Among the grounds of demurrer to the bill the third in
order is "that no contract is stated in said bill whereby the
defendant is obliged to furnish the plaintiffs or any of them
telephones and telephone service of the kind described in said
bill ; " and the fourth ground is "that by a proper construc-
tion of Ordinanne 110, stated in said bill, the defendant is not
obliged to furnish telephones and telephone service of the
kind described in said bill to plaintiffs (appellants), or any of
them, at the rates claimed in said bill." The matters em-
braced in these grounds of demurrer are such as the appellee
ought to bring before the Court by way of answer. They
cannot be properly treated and disposed of on demurrer.

The contention upon this phase of the demurrer is that the
meaning of the word telephone and what the term will em-
brace when used in contracts for telephone service has been
defined and fixed by statute in this State; and that the de-
scription of service to which the appellants allege themselves
entitled is not within the terms of Ordinance No. 110 under
which the rights of the appellants arose, when reference is had
to the statute in construing the ordinance. The legislation to
which is attributed this effect upon the rights of the parties
here is that enacted by the Acts of 1892, ch. 387, which added
to Art. 23 of the Code of Public General Laws, sub-title Tele-
graph and Telephone Companies, secs. 232A, 232B, 232C,
232D, and 232E ; and Act of 1894, ch. 207, which added to
said Article and sub-title of the Code, secs. 232F and 232G.
Of these sections thus added to the Code, secs. 232A and
232B prescribed maximum rates of charges for rental or use
of telephones by any "individual company or corporation, now
or hereafter owning, controlling, managing or operating any

telephone line. or lines within the limits of any city, town or village in the State.''    Sec. 232C defined what the word telephone ''shall be construed to include'' wherever used in the Act of 1892, ch. 387.    Sec. 232D required that every Telephone Company should supply all applicants with telephone connections and facilities ''without discrimination or partiality'' and made further provisions for protecting the rights of such applicants in securing such connections and facilities.    Sec. 232E made it a criminal offense for ''any owner, operator, agent or other person'' to collect or receive for the rental or use of any such telephone ''any sum in excess of the ratio fixed'' by the Act and provided a penalty therefor.

The subsequent legislation modified the foregoing by providing in sec. 232F that any person, firm or corporation might contract in the manner therein prescribed with any individual, company or corporation owning, &c., any telephone lines within the State ''for such special form, description and amount of telephone equipment and service expressed in such contract, as such person, firm or corporation may need, at such rates, and upon such terms and conditions as may be agreed upon;'' but provided that nothing in this section should be construed to impair the obligation of any person or corporation owning or operating any telephone line in this State to furnish, in accordance with the aforementioned sections of the Code enacted by the Act of 1892, ch. 387, and at the rates of charge mentioned in secs. 232A and 232B, telephone equipment and service of the kind and description which was, at the time, being furnished by the Chesapeake and Potomac Telephone Company of Baltimore City at the said rates; and required as a condition precedent to the exercise by the said company of any of the powers conferred by the Act of 1894, ch. 207 (secs. 232F and 232G of Art. 23 of the Code), that it should file in the office of the Clerk of the Court of Appeals to be annexed to the original of the Act a full and adequate description in detail, and to be certified so to be by the Governor, of the equipment then used by said company in furnishing the service mentioned in the proviso.    This descrip-

tion was to be taken as a true description of the "said equipment in all proceedings whether civil or criminal" which might be taken to enforce the requirements of the proviso or of the sections of Art. 23 of the Code therein mentioned.  Sec. 232G provides for the appointment of a commission by the Governor upon which is imposed the duty, under the powers conferred upon it, to make such investigations as should enable it to report what is the cost of furnishing to the city of Baltimore and other places telephone service "both that known as the ordinary or grounded service, and also that known as the metallic circuit service;" and to procure all such information as may "be necessary and proper to determine what ought to be fair and sufficient rates for furnishing such telephone service;" and to make report to the next General Assembly.

Exhibit No. I filed with the bill of complaint makes it appear that it is claimed by the appellee corporation that, at the time of the passage of Ordinance 110, under the statute, to which reference has been made, regulating maximum charges for telephone service and defining what the word telephone should be held to include, the ordinary telephone equipment to which the statute applied had been described as what is known as the grounded circuit service and that said ordinance must be taken as having reference to that equipment for, or description of, telephone service, and does not authorize the appellants to call for contracts for the metallic circuit service as claimed in their bill.

It is not perceived from a reading of the legislation in question, and which has been reviewed, how it can have a necessary effect in construing the Ordinance 110.  If it be assumed that the statute, in prescribing maximum rates of charges for telephone equipment and service, meant and was dealing with the ordinary grounded circuit service nothing is discovered in its terms or provisions which would prevent parties or corporations wishing to make contracts for furnishing telephone service from going to parties desiring to have such service furnished, and offering and contracting to furnish any kind or description of service that might be agreed upon provided

only that for the particular kind or description of service which was within the contemplation and provisions of the statute charges should not be in excess of the rates therein prescribed.    And so there is nothing to prevent a corporation organized for the purpose of furnishing telephone service from going to the Mayor and City Council of Baltimore (assuming for the present the power of the city to enter into such a contract), and in consideration of the right and privilege of using the subways and ducts of the city, obligating itself to make contracts with the citizens thereof to furnish any kind or description of service that it may choose to contract for within the like limitations.    The general intent and policy of the law in question was to prevent extortion in charges for telephone service and to secure fair and reasonable rates of charges for such service. It would be contrary to this intent and policy to so construe the law as to restrict or hinder parties in making contracts for the service that will secure for them, at cheaper rates than those fixed as the maximum in the statute, improved equipments and more effective appliances.    In other words to hold that parties are not free to secure contracts for a different and better telephone service than that with which the statute deals, at cheaper rates than the statute prescribes as a maximum for an inferior service.    A telephone company could not be required to enter into a contract for service at rates under those which the statute permits it to charge for the description of service to which the statute applies, but its voluntary action in entering into contracts is under no restraint either as to description of service or rates of charge provided the maximum statute rates are not exceeded in any case falling within its provisions.

The law expressly provides that contracts for special forms and description of service may be made under regulations prescribed.    We may suppose that this provision was made with a view to allow of contracts for higher rates, than those fixed as a maximum by the statute, in cases where parties desired to contract for special, or different and better equipments than those the statute contemplated when fixing the maximum

charges therein specified ; but parties would have the same right to make contracts of the same class at rates lower than the maximum rates of the statute, without going counter to either its letter or its spirit.    The statute does not fix a meaning to or give a definition of the word telephone; nor prescribe an amount or description of telephone equipment to be imported into all contracts for telephone service irrespective of the intention of the parties to the contracts.    The definition of the word telephone occurring in the Act of 1892 and the fixed description of telephone equipment provided for in the Act of 1894 have relation to the purposes of the legislation enacted by these two Acts.   Sec. 232C enacted by the former Act expressly provides what the word telephone "shall be construed to include wherever used" in that Act; and sec. 232F enacted by the later Act expressly provides that the fixed description of telephone equipment which it requires to have filed with the original Act in the office of the Clerk of the Court of Appeals shall be taken as a true description of said equipment in all proceedings civil and criminal which might be taken thereafter for the enforcement of the requirements of that section or of the sections of the Code enacted by the Act of 1892.    The legislation embraced in the two Acts referred to gave to parties seeking to make, or making contracts for telephone service certain rights, and wherever the provisions of the statute have to be availed of in the enforcement of those rights the definitions therein given of the word telephone and of telephone equipment apply; but there can be no reason for applying them, and they have no application, to cases in which parties by their own voluntary action enter into contracts, in no way violative of the provisions of the law, in which they fix for themselves the terms of their contracts and define for themselves what they are contracting for.                                      :

When, therefore, the appellee applied to the Mayor and City Council of Baltimore for the right to use the subways and ducts of the city for its corporate purposes there was nothing in the legislation we have been considering to prevent it from making the contract, which the appellants insist that it did

make, to furnish the citizens of Baltimore with telephone service at the rates specified in the Ordinance No. 110; and the kind and description of equipment and service that was to be supplied at the said rates we must look for, not in the law, but in the contract that was made.    To determine this question the Court is entitled to be advised of all the circumstances under which and the conditions with reference to which the contract was entered into.    In the case of *First National Bank* v. *Gerke*, 68 Md. 449, it was said at p. 456, CHIEF JUSTICE ALVEY delivering the opinion, "it is a principle of universal application that in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under which it was entered into.    General or indefinite terms employed in the contract may be thus explained or restricted in their meaning and application and the contract must be so construed as to give it such effect and none other as the parties intended at the time it was made.    These principles are elementary."    The instrument being construed in the case was a bond and it was further said "regard must be had to the intention of the parties when the bond was executed; and whatever facts will shed light upon the question of intention may be considered in construing the bond."

Now the ordinance here which constitutes the contract between the city of Baltimore and the appellee, in its fourth section where provision is made for furnishing to the citizens telephone service at the rate of forty-eight dollars for business places and thirty-six dollars per annum for dwellings, uses the word telephone generally and does not specify any particular description of service to be furnished.    The most natural and reasonable construction to be given, or meaning to be imputed, to the word telephone as here used is the telephone with all improvements, equipments and appliances essential in its operation to make it most effective in use.    If, as the appellee contends, the word is to have a restricted meaning, or a particular meaning the Court should be informed of the circumstances and conditions which will make this appear.    It has been seen that in the legislation which has been invoked as

affecting the construction of the ordinance in question two kinds or descriptions of telephone service are mentioned and recognized as in use—the one what is known as the grounded circuit service which the appellee insists is the one it is obligated to furnish under the ordinance; and the other the metallic circuit service which the appellants insist they are entitled to have. The Court is not informed judicially of the difference between these two descriptions of service; nor is it furnished with any information which enables it to say whether it is more probable and reasonable that one or the other was in the contemplation of the parties to the contract in question.

Again, the ordinance in question must have intended that the service to be furnished by the appellee should be effective in use; and while the appellee insists that the grounded circuit service is that which the Ordinance 110 provided for, the appellants contend that at the time of the passage of the ordinance that service was not effective for their purposes. It may be that conditions were then such as affecting the operation of that system that it was no longer effective. This contention between the parties cannot be settled upon demurrer, but must be by facts brought to the knowledge of the Court by evidence. Without pursuing this branch of the inquiry further it would seem that, as respects the grounds of the demurrer we have been considering, this is eminently a case in which the Court is entitled to know the circumstances and conditions surrounding the parties to the contract in question at the time it was made, in determining their meaning and intention as between the respective contentions here made.

The further grounds of demurrer are in substance that the appellants have not, in their bill, stated a case for relief in equity against the defendant, that they have no standing in a Court of equity to ask relief on the contract between the appellee and the Mayor and City Council of Baltimore and that their bill is multifarious. As to the rights of the appellants under Ordinance 110, and their standing in Court to enforce the same, the nature of the ordinance must determine. In the

light of the preamble to the ordinance there can be but little doubt as to the intent with which it was enacted or the main object it was intended to accomplish.    Its evident purpose was to minister to what it described as next to a public necessity. To make it practicable for the citizens of the municipality to more generally avail themselves of telephone facilities; and to that end to relieve them from the high prices of a corporation which was said to be then having "a monopoly of the telephone business" in the city of Baltimore, whereby these facilities were put "beyond the reach of persons of ordinary means" and were "confined to a favored few."    To secure for persons of moderate means the "great boon" and "to the business community at large" the "great advantages" of a cheaper "telephone service."    It is also evident that the ordinance was passed upon the faith of the appellee having "declared itself ready and willing to supply such service at rates very much lower than those "then prevailing."    The design of the ordi · nance therefore was the public good, to secure a public benefit and to promote the public welfare.    It was to that extent legislation, and if, in this aspect, it was within the powers of the municipality to enact it, it was something more than a mere contract with the appellee for the purposes of the municipality as a corporate entity.

The power under which the municipality proceeded in enacting the ordinance in question is found expressed in sec. 819A of Art. 4 of the Code of Public Local Laws as enacted by the Act of 1890, ch.   370, and is in these words "The Mayor and City Council of Baltimore shall have power to regulate the use of the streets, lanes and alleys in said city by railway or other tracks, gas or other pipes, telegraph, telephone, electric light or other wires and poles, in, under, over or upon the same, and may require all such wires to be placed under ground, after such reasonable notice as they may prescribe."    The same power is contained in the present charter of the city, sec. 6, as enacted by the Act of 1898, ch. 123.

This provision of the charter of the city of Baltimore was before this Court for construction in the case of *Lake Roland*

*Elevated Ry. Co.* v. *Mayor, C. C. of Balt.*, 77 Md. 352 where, having reference to the Act of 1890, ch. 370, JUDGE BRYAN, delivering the opinion of the Court, said: "It has been for a long time recognized as the law that the Mayor and City Council of Baltimore have full and complete control over the streets and highways of the city. It has been considered, however, that certain uses could not be made of them without the sanction of an Act of the General Assembly. For this reason the Legislature saw fit to enlarge the corporate powers of the city." And CHIEF JUSTICE ALVEY who delivered a separate opinion upon the motion for re-argument of the case said in relation to the provision in question that it was "but an amplification of their (the city's) general power over and right and duty to regulate and maintain the streets and other highways of the city for the use of the public."

Having thus recognized and asserted the full and ample power of the municipality over the subjects committed to its control under the provision of law to which reference is now being made the case distinctly held that the municipality in the exercise of such power was acting in a legislative capacity; that it was discharging a trust committed to it for the public benefit; and that it could not relieve itself of the duty it owed to the public—it could not divest itself of the power and the corresponding duty and could not abridge it. In the course of his opinion JUDGE BRYAN refers several times to the power in question as a legislative power and makes this the foundation of the theory upon which the case was decided; and CHIEF JUSTICE ALVEY in his opinion says "the power vested in them (the Mayor and City Council) in respect to the streets, is of a legislative character; and they can neither restrict themselves, nor their successors, by any irrepealable ordinance, in the exercise of such power over the streets except it be by express authority of the Legislature of the State."

The character and nature of the power to be exercised by the Mayor and City Council of Baltimore, in making regulations and granting permission for the use of its street for any of the purposes named in the provision of law by which such

power is conferred, having been thus defined, was the municipality acting within the purview of such power in imposing upon the appellee the condition expressed in sec. 4 of Ordinance 110 as respects the rates of charges therein specified for telephone service. It is contended that the condition annexed to the ordinance in this respect is an attempt on the part of the Mayor and City Council to exercise the function of the Legislature which alone can prescribe or regulate the compensation of a public service corporation. This does not result from any fair construction of the ordinance. It is for the Legislature to grant, or provide for granting, charters to corporations; and in making such grants to impose, at its pleasure, restrictions and limitations upon the powers to be exercised by them when created. It can, at pleasure, regulate, in the charters of public service corporations, the compensation which they may exact for services incident to the object of their creation. These regulations when imposed are limitations upon the powers of the corporation, and they must in making contracts and carrying out their purposes act within the limitations so imposed; but acting within these limitations the corporation has the right to make contracts at its pleasure and do any act for carrying out its legitimate purposes.

Now when the ordinance in question was passed by the Mayor and City Council of Baltimore and accepted by the appellee corporation, the latter had its charter and was subject, in making its contracts. only to the limitations which the law imposed. Within these limitations it was free to contract. In passing the ordinance the municipality made no attempt to interfere with the chartered rights of the appellee or to abridge its chartered powers. It did not attempt of its own authority and right, to impose upon the appellee, *in invitum*, the rates of charge for telephone service specified in the ordinance. The appellee had, at the time of the passage of the ordinance, the right to refuse to accept its terms. In accepting these it was acting within its chartered powers and in the free exercise of its chartered rights. All of the obligations imposed by the ordinance were imposed by the appellee upon itself by its own vol_

untary action in accepting the ordinance.    As well might it be
said, if the ordinance had omitted the condition as to rates of
charge, that the appellee in contracting with individuals at the
rates mentioned in the ordinance, which it would have had the
right to do, was being subjected to an illegal imposition, as to
say that the ordinance in question, under the circumstances
appearing here, is to be taken as having that effect.

While there was no attempt on the part of the Mayor and
City Council of Baltimore to usurp the function of the Legis-
lature by imposing the condition expressed in sec. 4 of Ordi-
nance 110, in undertaking thereby the regulation of the com-
pensation of a public service corporation, they would seem to
be, in incorporating the condition mentioned in the ordinance
within their limited or *quasi* legislative power in respect to the
control of the streets and of their use or occupation by "tele-
graph, telephone, electric light or other wires and poles in,
under, over or upon the same."    The municipality in having
the control of the streets as indicated is invested with a trust
for the benefit of the community and has imposed upon it a
duty to the general public in that connection.    The law gives
to the municipality the right to regulate the use of its streets;
and requires of a public service corporation that it shall ob-
tain from the municipality the requisite authority to use the
streets and highways thereof where such use is desired for its
corporate purposes.    It cannot be the duty of the municipal
authorities to grant such use for the mere advantage of the
corporation, while it is their duty, in granting the same, to se-
cure the largest measure of advantage to the general public
with a just regard for the rights of the corporation.

It would seem to be but a reasonable incident to, and exer-
cise of, the power to regulate the use of the streets and high-
ways which has been conferred by the provision of law we are
here considering, that, where a public service corporation gets
permission to use such streets and highways for its corporate
purposes, and such purposes consist in making contracts with
the citizens of the municipality to which the power is entrusted,
and exacting from them compensation for a service that for

urgent reasons of convenience or the necessities of business conditions they must avail of, the permission can be granted under such regulations as to rates of charges as will protect the community against extortionate exactions and secure fair and reasonable terms in availing of the facilities which the corporation furnishes. It cannot be here objected by the appellee that the regulation contained in the ordinance here in question as to rates of charge was not a reasonable one. The time to have urged such a consideration was before it accepted the ordinance and availed of the privileges it acquired thereunder. Whatever may have been the description of service the appellee was to furnish under the Ordinance 110 it would seem to be concluded as to the reasonablenes of the rates of charge for that description of service by its own voluntary action.

It follows from the construction, and the effect, which we think it proper to give to the power conferred by law upon the Mayor and City Council of Baltimore in pursuance of which Ordinance 110 was enacted by them that the ordinance imposed upon the appellee a duty to the general public which the members thereof have a right to enforce against it in conditions which will show that it is violating such duty. There are authorities which seem to be directly in point going to support the views which have been expressed. In the case of the *People ex rel Jackson* v. *Suburban R. R. Co.,* 178 Ill. 594, the village of River Forest a municipal corporation organized under the general statutes of the State of Illinois, granted by ordinance to a suburban railroad company permission to use the streets of the municipality under regulations prescribed in the ordinance. Among these regulations a section of the ordinance "provided that the rate of fare should not exceed ten cents for one continuous ride of one trip from any point on said railroad in River Forest to any station on the loop line or some point in the city of Chicago," &c. "Provided that the fare between any point on said railroad in the village of River Forest and any of the said points in the city of Chicago or the said point of connection of said railroad with

any elevated railroad as aforesaid, and intermediate points'
shall not exceed the fare charged at any point in the town of
Cicero west of the east line of central avenue or in the village
of Harlem or in either of them, to the same points or return
either for single trip or at commutation rates or otherwise."
The railroad company in 1898 while maintaining the rate of
ten cents in the village of River Forest and the same for return
or intermediate points, that being the highest rate of fare,
offered for sale and sold twelve tickets for a dollar good for
one continuous ride over its road in the town of Cicero only
and refused to sell tickets for twelve rides for one dollar from
any point in River Forest but continued to charge ten cents,
&c.    A *mandamus* was sued out by the relator to compel the
company so long and at such times as it sold tickets at the
rate of twelve for a dollar from the town of Cicero, &c., to sell
tickets at the same rate from any point on its line in the vil-
lage of River Forest, &c.    The Supreme Court ordered the
writ accordingly, and in the course of the opinion in the case
said "while it is true the charter of a street railway corpora-
tion is granted under the general laws of the State, yet a char-
ter so obtained gives but the bare power to exist.    In order
to enable such a corporation to carry out the sole purpose for
which it has existence it must have a further exercise of sov-
ereign power in its behalf.    Some city or village clothed by
delegation with authority to exercise sovereign power pos-
sessed by the State must grant such corporation authority to
enter upon its streets and alleys and construct and operate its
road there.    The power possessed by the State to attach as
conditions to such a grant the performance of duties owing by
a *quasi* public corporation to the public and directly beneficial
to the public may be exercised by a municipality in the exer-
cise of the power by it possessed, by delegation from the State,
to permit the use of its streets, alleys and public places by the
corporation."

In the case of *Rice* v. *Detroit, &c., Ry.*, 122 Mich, 677, a
similar franchise was granted to the railway by the village of
Dearborn and among other regulations, rates of fare to be

charged by the railroad were prescribed in the ordinance granting the franchise. The railroad failed to provide certain tickets to be sold to passengers at the prescribed rate so that they could be had at a point where the same were called for by a passenger whereby the passenger was compelled to pay fare in excess of the prescribed rate and he was permitted to recover the excess of fare paid in an action of *assumpsit.*

In the case of *Westfield Gas & Milling Co.* v. *Mendenhall et al.*, 142 Ind. 538, an Act of the Legislature of Indiana of 1887 had provided that incorporated towns and cities could provide by general ordinance to reasonably regulate the supply, distribution and consumption of natural gas within their respective corporate limits and to require a fee for the use of the streets, &c. The town of Westfield, a municipal corporation, passed such an ordinance and provided a maxium schedule of rates to be charged to consumers for the supply of gas and fixed the price to be charged for kitchens and cook stoves at eighty cents per month for twelve months—$9.60 per year. Under said ordinance the Westfield Gas and Milling Company contracted with the municipality for furnishing gas to the inhabitants thereof and agreed "that in consideration of the town waiving its rights by law to require" the Gas Company to pay a license fee for the use of the streets, to furnish gas to consumers in the town "in accordance with a schedule of rates and prices fixed by said ordinance."

The Gas Company afterwards gave notice that when contracts with consumers then current should expire it would charge thereafter one dollar per month for the use of gas for cook stoves instead of eighty cents the then rate of charge. Certain of the inhabitants of the town who were consumers of gas and patrons of the gas company applied for an injunction to restrain said company "from carrying out its purpose to deprive them of the use of natural gas from the plant of the" company "upon the ground" that they "had refused to pay a price therefor in excess of the maximum rate fixed" by the ordinance. There was a demurrer to the bill of complaint and the same was overruled by the lower Court whose action

was affirmed on appeal.   The Appellate Court in its opinion said "The town had the right in granting the use of its streets, to impose such resonable requirements, terms, regulations and conditions therein, upon those accepting the privileges and benefits of the grant, as its own prudence and discretion might dictate, so as not to restrict however, the town in its legitimate exercise of legislative powers.   The authority to prescribe such terms and conditions, if not expressly conferred by the Act of 1887, may at least be reasonably inferred therefrom, in order that the full force and effect may be given to the power expressly granted."

Upon both reason and authority which commends itself to our approval we think the appellants have rights under the Ordinance No. 110 which they are entitled to enforce in this proceeding against the appellee.

The remaining ground of demurrer to be considered is that the bill of the appellants is multifarious because the appellants have contracts with the appellee each of which is distinct and separate from the other.   We do not think the bill is open to this objection.   "As to the doctrine of multifariousness all the authorities agree that there is no rule of universal application, and all concede that much must be left to the discretion of the Court in particular cases," see *Brian et al.* v. *Thomas et al.*, 63 Md. 476–480; *Neal et al.* v. *Rathell et al.*, 70 Md. 592–598.   While it is true that the appellants have distinct and separate contracts with the appellee, and the facts alleged in connection with these contracts are to some extent variant, yet this under the circumstances of the case can create no difficulty or embarrassment in decreeing the relief which the bill seeks.   The appellants all have a common interest in enforcing the duty imposed upon the appellee under the Ordinance No. 110 and this is, in substance and effect, what the bill asks to have done.   The ordinance is the source and foundation of the rights asserted by all the appellants and in effect the relief prayed is that the ordinance may be decreed effective.   The decree will be against the same defendant and in substance will give the same

relief to each and all of the appellants.    The case bears an analogy, in the aspect we are now considering to the case of *Mayor and City Council of Balt.* v. *Gill et al.,* 31 Md. 375, where the complainants had distinct and separate interests affected by the causes of complaint and yet had a common interest in having the source and foundation of these causes removed.

As a consequence of the views herein expressed the decree of the Court below sustaining the demurrer to the bill of the appellants and dismissing the bill must be reversed.

*Decree below reversed and cause remanded with costs to the appellants.*

(Decided February 24th, 1904.)