685 A.2d 772

## BOARD OF LIQUOR LICENSE COMMISSIONERS FOR BALTIMORE CITY

v.

## FELLS POINT CAFE, INC.

**No. 128, Sept. Term, 1995.**

Court of Appeals of Maryland.

Nov. 13, 1996.

Reconsideration Denied Dec. 27, 1996.

Gerald Langbaum, Assistant Attorney General, Annapolis (J. Joseph Curran, Jr., Attorney General, Baltimore, John K. Barry, Assistant Attorney General, Annapolis, on brief), for appellants.

George D. Bogris (William F. Gately, Howell, Gately, Whitney & Carter, on brief), Towson, and (Melvin J. Kodenski, Kodenski and Canaras, on brief), Baltimore, for appellee.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

In this case, we are called upon to decide whether the Board of Liquor License Commissioners for Baltimore City possessed the authority to impose restrictions on an individual license with the consent of the licensee and whether additional restrictions may be imposed on the license thereafter as a sanction for violating the consented to restrictions. For the following reasons, we answer the first question in the affirma-

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

tive and the second question in the negative. We also hold, as a preliminary matter, that the Petitioners filed a timely notice of appeal.

I.

The facts in this case are as follows. On November 4, 1993, a hearing was held by the Board of Liquor License Commissioners for Baltimore City ("the Board") on an application to transfer the ownership of a liquor license to the Licensees [1] and to modify the restrictions that had been placed on the license. The restrictions had been placed on the license as a result of protracted conflict between the previous license holders and the neighborhood residents over the operation of a club called the Sanctuary. The Fells Point Homeowners' Association ("the FPHA"), an organization of neighborhood residents, initially opposed the transfer of the license to the Licensees, most likely because they feared another club like the Sanctuary. In an effort to convince the FPHA not to oppose the transfer of the license, the Licensees agreed to have certain conditions placed on their operations that would make the establishment more compatible with neighborhood living. The FPHA agreed not to oppose the transfer of the license at the November 4, 1993 hearing in exchange for the concessions by the Licensees.

At the November 4, 1993 hearing, the Licensees argued that the Board should transfer the license because the Licensees and the FPHA had "entered into a written agreement which set[ ] forth restrictions on the [l]icense which [met] the needs of both sides." The Licensees requested that the written agreement dated November 4, 1993 be incorporated into the license "as a restriction." The restrictions in the agreement included what kinds of music and other entertainment were prohibited, under what conditions dancing would be allowed, what percentage of revenue had to be derived from the sale of food and specific restrictions on the sale of beer, wine and

---

1. The Licensees are Justin Walters, Thomas Hicks and Christopher Francis.

liquor. Before the Board would agree to the transfer, however, it questioned the prospective Licensees extensively and sought assurances that the premises would be operated as a restaurant and not as a nightclub or bar. It appears from the transcript of the November 4, 1993 hearing that the Board had had some problems with the establishment formerly known as the Sanctuary, which was a nightclub, and that the license was only transferred because the Licensees had expressly agreed that the premises would be used as a restaurant.[2] The Board granted the application to transfer the license subject to the restrictions set forth in the agreement and on the license. The face of the license contains the following restriction: "Must operate in line with the conditions set forth in the agreement with the Fells Point Homeowners Association, the agreement dated November 4, 1993."

On December 1, 1994, a public hearing was held by the Board to determine, among other things, whether the Licensees had violated the restrictions contained in the November 4, 1993 agreement.[3] At the hearing, the Licensees moved to dismiss the charges against them on the ground that the November 4, 1993 agreement was binding on the community and the Licensees only and was not enforceable by the Board. The Licensees asserted that, as to the Board, the restrictions in the agreement were "null and void." The Board argued that it did have the power to restrict an individual license and that it had been doing so for many years, whenever it believed that such restrictions would be in the best interests of the community.

---

2. The agreement actually covers all "the property of 723 South Broadway." 723 South Broadway houses three separate entertainment establishments. The large room in the front of the premises, formerly the Sanctuary, is the area that was to become a restaurant. The smaller front room is the Fells Point Cafe and the large room in the rear is a theater; neither of these establishments is at issue in this case.

3. The violations were alleged to have occurred in only one of the entertainment establishments, the large room in the front of the premises formerly known as the Sanctuary.

The Board concluded that the November 4, 1993 agreement had been accepted by the Licensees and the FPHA and that the Board had accepted the agreement as a binding restriction on the license. The Board also stated that it had the authority, under Article 2B, to impose such restrictions. After finding that the Licensees had violated many of the restrictions in the agreement and that the premises were being used primarily as a nightclub or bar, the Board imposed the following, additional restrictions, effective December 8, 1994: no live entertainment, no D.J., no dancing, no exotic entertainment.

The Licensees sought judicial review of the Board's decision in the Circuit Court for Baltimore City and obtained a stay of the Board's Order. The Board and several interested individuals [4] (collectively "the Petitioners") responded to the Licensees' petition. A hearing was held on May 15, 1995 before the Honorable Hilary D. Caplan. Judge Caplan found that the Board lacked statutory authority to impose any restrictions on a license not expressly provided for in Article 2B and he stated: "the decision of the Board of Liquor License Commissioners is hereby reversed. . . ." The Judge asked counsel to prepare an order to that effect. An order was prepared and was signed by Judge Caplan on May 17, 1995. The order stated that the decision of the Board was "REVERSED for the reasons articulated by the Court in its oral ruling from the bench and in the Court's Memorandum Opinion attached hereto." [5] The Order was docketed on the same day; the docket entry read: "ORDER OF COURT THAT THE DECISION OF THE BOARD IS REVERSED; COSTS TO BE PAID BY RESPONDENTS (CAPLAN, J)."

On May 23, 1995 and May 25, 1995, the Board and the interested individuals, respectively, filed motions for reconsideration. The Licensees filed a motion in opposition to the

---

**4.** The individuals are: Courtney Capute, Arnold Capute, Thomas Durel, Timothy Duke, Cecilia Ives and MaryRose Whelley.

**5.** There was no Memorandum Opinion attached to the Order.

motions for reconsideration on June 8, 1995. Judge Caplan held a hearing on the motions on June 16, 1995. After arguments on the motions concluded, Judge Caplan gave the parties ten days to present any additional materials for consideration on the motions. He told the parties to expect his ruling "sometime by the middle of July." Later in the day, on June 16, 1995, the Board and the interested individuals, apparently believing that an appeal had to be filed within 30 days of the May 17, 1995 docket entry, filed notices of appeal to the Court of Special Appeals of Maryland. On July 19, 1995, Judge Caplan filed a Memorandum Decision and Order, which restated his conclusion that the Board lacked authority to impose restrictions on the license and which implicitly disposed of the outstanding motions.

The Licensees filed, in the Court of Special Appeals, a Motion to Dismiss the appeals of the Board and the individual appellants on the grounds that they failed to note timely appeals pursuant to Maryland Rule 8–202(a). The Court of Special Appeals denied the motion on September 26, 1995. We granted a writ of certiorari, on December 19, 1995, before the case could be reviewed on its merits by the Court of Special Appeals in order to consider the important issues raised by the appeal. In their brief to this Court, the Licensees have again moved to have the Petitioners' appeals dismissed on the grounds that they were not timely.

## II.

The threshold issue that we must address is whether the Petitioners filed timely notices of appeal. A notice of appeal must be filed within thirty days after the entry of the judgment or order from which an appeal is to be taken. Maryland Rule 8–202(a). The Licensees argue that when the Petitioners filed their notices of appeal, on June 16, 1995, in response to the Order docketed May 17, 1995, there was no final judgment from which an appeal could be taken. The Licensees argue that a final judgment was entered in the circuit court on July 19, 1995, the date that Judge Caplan filed the Memorandum Decision and Order. The Licensees assert

that because the Petitioners did not file additional notices of appeal within 30 days after the entry of the Memorandum Decision, their opportunity for appellate review expired.

The Petitioners filed a response to the Licensees' motion in which they argued that Judge Caplan rendered a judgment on May 15, 1995, which became final when the order was signed and entered on the docket on May 17, 1995. The appellants argue that their appeal, filed on June 16, 1995, was timely because it was filed on the thirtieth day after the final judgment was entered. We agree, and we hold that the Circuit Court for Baltimore City granted a final judgment, from which the Petitioners could appeal, on May 17, 1995.

The Maryland Rules define a judgment as "any order of court final in its nature entered pursuant to these rules." Maryland Rule 1–202(m). Maryland Rule 2–601 prescribes the manner in which a judgment must be entered:

> "(a) When Entered.—Upon a general verdict of a jury or upon a decision by the court allowing recovery only of costs or a specified amount of money or denying all relief, the clerk shall forthwith enter the judgment, unless the court orders otherwise. Upon a special verdict of a jury or upon a decision by the court granting other relief, the clerk shall enter the judgment as directed by the court. Unless the court orders otherwise, entry of the judgment shall not be delayed pending a determination of the amount of costs.
>
> (b) Method of Entry—Date of Judgment.—The clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of entry. That date shall be the date of the judgment."

Maryland Rule 2–601(a), (b).

Rule 1–202(m) and Rule 2–601, taken together, "make clear that two acts must occur for an action by a court to be deemed the granting of a judgment: the court must render a final order and the order must be entered on the docket by the clerk." *Davis v. Davis*, 335 Md. 699, 710, 646

A.2d 365, 370 (1994). Once both steps have occurred, rendition and entry, a judgment has been created. *Id.* *"Rendition* of judgment is ... the court's pronouncement, by spoken word in open court or by written order filed with the clerk, of its decision upon the matter submitted to it for adjudication." *Id.* The *entry* of a judgment is the "purely ministerial act" of placing a judgment in the permanent record of a court. *Id.*

Whether a judgment has been rendered is a determination that must be made on a case by case basis and that "turns on whether the court indicated clearly that it had fully adjudicated the issue submitted and had reached a final decision on the matter at that time." *Davis,* 335 Md. at 710–11, 646 A.2d at 370. A reviewing court will focus on the words spoken and the actions taken in the lower court to make such a determination. *Davis,* 335 Md. at 711, 646 A.2d at 371.

On May 15, 1995, Judge Caplan stated: "So the decision of the Board of Liquor Commissioners is hereby reversed, and costs will be paid by the Board. Thank you." These words clearly indicate that the court "had fully adjudicated the issue submitted and had reached a final decision on the matter at that time." Furthermore, Judge Caplan twice referred to the appeal to the Court of Special Appeals that he knew was imminent. In reference to his reversal of the Board, Judge Caplan said of the Court of Special Appeals: "If I am wrong, they will correct me." In response to a question from Licensees' counsel *regarding* restrictions on the license, Judge Caplan responded: "I am not going to lift them until ... the Court of Special Appeals has spoken. I am at this juncture reversing the Board." We think the Petitioners could justifiably conclude that Judge Caplan reached a final decision and rendered a judgment.

The order signed by the court on May 17, 1995 was entered on the docket the same day. The docket for May 17, 1995, reads as follows: "ORDER OF COURT THAT THE DECISION OF THE BOARD IS REVERSED; COSTS TO BE PAID BY RESPONDENTS (CAPLAN, J.)." In the margin next to those words is the abbreviation "CLOS," the clerk's

notation that the case was closed on that day. Thus it appeared from the docket entries that there was a final judgment on May 17, 1995, when the decision that was rendered by the circuit court was entered on the docket.

Whether a party may appeal a judgment of a court depends on whether that judgment is "final." Maryland Code (1995 Repl.Vol.), Courts & Judicial Proceedings Article, § 12–301.

> "If a ruling of the court is to constitute a final judgment, it must have at least three attributes: (1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601."

*Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767, 773 (1989). The Licensees argue that the first *Rohrbeck* requirement is lacking and, therefore, that this appeal must be dismissed.

The Licensees argue that it was impossible for Judge Caplan to issue a final disposition on May 15, 1995. In support of their argument, the Licensees point to Md.Code (1957, 1996 Repl.Vol.), Art. 2B, § 16–101(e)(4)(i),[6] which states: "If the court reverses the action of the local licensing board it shall file with the papers a written statement of the reasons." Based on the plain language of that statute, the Licensees argue, Judge Caplan could not render a final judgment until he filed a written statement of the reasons for his reversal of the Board. The Licensees argue that Judge Caplan did not satisfy the requirements of § 16–101(e)(4)(i) until July 19, 1995, when he filed the Memorandum Decision and Order, and that the appeals filed by the Petitioners before that date were ineffective. No additional notice of appeal was filed by either Petitioner within 30 days after July 19, 1995.

---

6. Unless otherwise indicated, all subsequent statutory references are to Maryland Code (1957, 1996 Repl.Vol.), Article 2B.

The Licensees focus on the following language as proof that Judge Caplan did not intend to render "an unqualified, final disposition of the matter in controversy" on May 15, 1995:

"[BOARD'S COUNSEL]: * * * And when this court reverses the board, it is required to do so by written memorandum.

THE COURT: Yes, So I'll get the—the memorandum will be submitted. I mean, the order will be submitted to me. The memorandum will be basically adopting the arguments that I have heard on their side of the memorandum that they have. And I will do it in short form, because I think it is rather long in its body. But the court will do so."

They argue that because Judge Caplan intended to write a memorandum, his disposition of the action was not "unqualified."

In some instances, however, an oral statement dictated by the judge on the record to the court reporter satisfies the requirement of a written statement. In *Smith v. State*, 306 Md. 1, 11, 506 A.2d 1165, 1170 (1986), this Court applied and interpreted the United States Supreme Court's decisions in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). *Morrissey* and *Gagnon* held that a probationer is denied due process of law if his or her probation is revoked without a written statement explaining the reasons therefore and the evidence relied on. The purposes behind the written statement are to help "insure accurate fact finding with respect to any alleged violation and [to] provide[ ] an adequate basis for review to determine if the decision rests on permissible grounds supported by the evidence." *Black v. Romano*, 471 U.S. 606, 613–14, 105 S.Ct. 2254, 2259, 85 L.Ed.2d 636, 644 (1985).

In *Smith*, a defendant's probation was revoked without a written statement of the reasons. We said, however, that the written statement requirement of *Morrissey* and *Gagnon* could "be satisfied by the trial judge dictating the reasons for revoking probation, on the record, to the court reporter or

other authorized medium of court reporting." *Smith*, 306 Md. at 11 n. 3, 506 A.2d at 1170 n. 3; *see also Soden v. State*, 71 Md.App. 1, 6 n. 4, 523 A.2d 1015, 1017 n. 4 (1987) (extending *Smith* to include colloquy between counsel and judge on the record as oral statement which satisfies written statement requirement). A dictation, on the record, of the reasons for revoking probation fulfills the function of the written statement.

In *Thomas v. State*, 99 Md.App. 47, 635 A.2d 71, *cert. denied*, 334 Md. 632, 640 A.2d 1133 (1994), the Court of Special Appeals interpreted Maryland Rule P3b, which states, in part: "Where a direct contempt is committed, the court shall sign a written order to that effect." Maryland Rule P3b. The purpose of the written order requirement is to enable a reviewing court "to determine by an inspection of the record, whether a contempt has been committed and whether the court had jurisdiction to punish it." *Jones v. State*, 32 Md.App. 490, 497, 362 A.2d 660, 664 (1976).

In *Thomas*, the defendant had been held in direct contempt of the circuit court, but no written order was made evidencing the contempt judgment. 99 Md.App. at 51, 635 A.2d at 73. Although the judgment was vacated for failing to comply with all of the Rule's requirements, the Court of Special Appeals said that dictating "findings sufficient to constitute a basis for a criminal contempt judgment" to a court reporter satisfied the written order requirement of Rule P3b. *Thomas*, 99 Md.App. at 56, 635 A.2d at 75. Again, dictating findings on the record serves the purposes behind the written order requirement.

In this case, shortly before Judge Caplan stated that he was reversing the decision of the Board, he dictated the reasons that he was doing so to the court reporter on the record. He said:

"I am convinced that [the Licensees' attorney] is correct in his analysis that this is an enabling statute, and that the powers that are explicitly stated do not refer, as they argue to the restrictions that are part of the enabling statute.

And that this is not necessarily implicit. And I believe the 10–501(b) exception that was created by the legislature speaks to this, and tells us what the legislature is thinking. And *Baines [v. Board of Liquor License,* 100 Md.App. 136, 640 A.2d 232 (1994)]*,* on the other side, tells us what I think the Court of Special Appeals is thinking."

A primary purpose behind the written statement requirement of § 16–101(e)(4)(i) is to enable an appellate court to determine the grounds upon which a decision of the Board was reversed and whether sufficient evidence existed for such a reversal. We think that Judge Caplan's complete explanation on the record satisfies this purpose.

Furthermore, Judge Caplan's words regarding the preparation of a memorandum are not necessarily inconsistent with an intention to render "an unqualified, final disposition of the matter in controversy." Instead, Judge Caplan's words may indicate that he considered the memorandum to be a mere formality, intended only to memorialize the grounds for the decision that he rendered on May 15, 1995.

In *Rohrbeck, supra,* we also said the following about the finality of a judgment:

"we now make clear that, whenever the court ... indicates that a written order embodying the decision is to follow, a final judgment does not arise prior to the signing and filing of the anticipated order unless (1) the court subsequently decides not to require the order and directs the entry of judgment in some other appropriate manner or (2) the order is intended to be collateral to the judgment."

318 Md. at 42, 566 A.2d at 774. The instant case can be distinguished from *Rohrbeck* because what is at issue here is Judge Caplan's indication that a written memorandum was to follow the decision, not a written order. The written order reversing the Board that Judge Caplan asked the parties to prepare on May 15, 1995 was filed on May 17, 1995. Furthermore, if we were to decide that the language quoted above from *Rohrbeck* also applied to the written memorandum that Judge Caplan was planning to write, it would not affect our

decision today. As we explained above, Judge Caplan did not necessarily intend that the written statement be the primary embodiment of his decision. He thoroughly explained the grounds for his decision from the bench and signed an order reversing the Board. He may have agreed to draft the written statement merely to memorialize the grounds for his decision.

Finally, there was compliance with the formal requirements for a final judgment. The formal requirement for a judgment is its entry on a docket by the clerk in accordance with Maryland Rule 2–601. *Doehring v. Wagner*, 311 Md. 272, 275, 533 A.2d 1300, 1302 (1987). "Rule 2–601 makes it clear that whether a final judgment has been entered must be determined by reference to the docket entry. Accordingly, the date and form of a docket entry purporting to enter final judgment take on special significance." *Waller v. Maryland Nat'l Bank*, 332 Md. 375, 378, 631 A.2d 447, 449 (1993). The form of the May 17, 1995 docket entry in this case was clearly sufficient under Rule 2–601; it recited without qualification: "ORDER OF COURT THAT THE DECISION OF THE BOARD IS REVERSED; COSTS TO BE PAID BY RESPONDENTS (CAPLAN, J.)." *See Doehring*, 311 Md. at 276, 533 A.2d at 1302.

"The value of a simple docket entry which . . . make[s] clear to everyone the disposition of each and every claim in a case cannot be overemphasized." *Estep v. Georgetown Leather*, 320 Md. 277, 287, 577 A.2d 78, 82 (1990). "Under [Rule 2–601] . . . [l]itigants and third persons can look at the file or docket to determine when the judgment was entered, and they are entitled to rely on that date as a public record." *Waller*, 332 Md. at 379, 631 A.2d at 449 (quoting PAUL V. NIEMEYER & LINDA M. SCHUETT, MARYLAND RULES COMMENTARY, 446 (2d Ed.1992)).

*Edsall v. Anne Arundel County*, 332 Md. 502, 632 A.2d 763 (1993), provides another basis for validating the case at bar. In that case, the Court of Special Appeals certified to this Court the following question of law: "If a notice of appeal is

filed prior to the withdrawal or disposition of a timely filed motion under Rule 2–532, 2–533, or 2–534, must a new notice of appeal be filed within 30 days after withdrawal or disposition of the motion, or does the earlier filed notice of appeal suffice to constitute a timely appeal?" *Edsall*, 332 Md. at 503, 632 A.2d at 763–64. The Edsalls filed a motion to alter or amend a judgment, pursuant to Rule 2–534, nine days after the trial court entered a final judgment against them. *Edsall*, 332 Md. at 503, 632 A.2d at 764. They filed a notice of appeal 26 days after the final judgment was entered against them and 19 days before the motion to alter or amend was denied. *Id.* The Edsalls did not file another notice of appeal after the motion to alter or amend was disposed of. *See id.* The Respondent argued that the only notice of appeal filed by the Edsalls was "ineffective because the finality of the judgment [against them] had been interrupted by the timely filing of the motion to alter or amend the judgment." *Edsall*, 332 Md. at 503–04, 632 A.2d at 764. Our answer to the certified question was that the timely notice of appeal filed in accordance with Rule 8–202(a) did not lose its efficacy simply because one of the post-judgment motions specified by the Rule had been filed. *Edsall*, 332 Md. at 506, 632 A.2d at 765.

The structure of this case is similar to the *Edsall* case. A final judgment was entered against the Petitioners on May 17, 1995. Motions to Reconsider were filed by the Board and the individual appellants on May 23, 1996 and May 25, 1996, respectively, pursuant to Rule 2–535. If a Motion to Reconsider is filed within ten days after the entry of a final judgment, and both motions in this case were, the motion shall be treated as a motion under Rule 2–534, the same motion filed in *Edsall*. *Alitalia v. Tornillo*, 320 Md. 192, 200, 577 A.2d 34, 38 (1990). Each Petitioner filed a notice of appeal on June 16, 1996, 30 days after the final judgment was entered and 33 days before the Motions to Reconsider were disposed of. Thus, this case has the same structure as *Edsall* and must be resolved accordingly. We conclude that the Petitioners' appeal was timely filed pursuant to 8–202(a) and that the Licensees' Motion to Dismiss must be denied.

### III.

At the December 1, 1994 hearing, the Board found that the Licensees had violated some of the provisions of the agreement that was incorporated into the license as a restriction. As a sanction, the Board imposed the following, additional restrictions: no live entertainment, no D.J., no dancing, no exotic entertainment. Under the initial, consented to restrictions, dancing, live entertainment, and a D.J. were permitted under certain conditions. Under the restrictions that were imposed as a sanction, however, dancing, live entertainment, and a D.J. would not be permitted under any circumstances. Exotic entertainment was not permitted under the initial, consented to restrictions or under the restrictions that were imposed as a sanction. We hold that the Board exceeded its authority by imposing the additional restrictions as a sanction.

We addressed the Board's power to impose restrictions as a sanction in our recent decision, *Board of Liquor License Commissioners for Baltimore City v. Hollywood Productions, Inc.*, 344 Md. 2, 684 A.2d 837 (1996). In *Hollywood Productions*, after a nightclub was found to be in violation of Rule 3.12 of the Liquor Board Rules and Regulations,[7] the Board imposed a restriction on the club's hours of operation as a sanction. 344 Md. at 6, 684 A.2d at 839. We held that the Board exceeded the confines of its expressly and impliedly delegated powers. *Hollywood Productions*, 344 Md. at 16, 684 A.2d at 844.

In reaching our decision in *Hollywood Productions*, we first noted that the power to restrict an establishment's hours of operation was not expressly authorized by Article 2B. 344 Md. at 9–10, 684 A.2d at 841. We then explained that whether such a right may be implied as part of the Board's general

---

7. Rule 3.12 of the Rules and Regulations of the Board of Liquor License Commissioners of Baltimore City states: "Licensees shall operate their establishments in such a manner as to avoid disturbing the peace, safety, health, quiet, and general welfare of the community."

regulatory authority "turns on the General Assembly's intent in empowering the agency and the statutory scheme under which the agency acts." *Hollywood Productions,* 344 Md. at 11, 684 A.2d at 842. We examined both the General Assembly's intent and the applicable statutory scheme.

In *Hollywood Productions,* we stated:

"The General Assembly's detailed regulation of the alcoholic beverages industry suggests that where [the General Assembly] intends a liquor board to have a particular enforcement mechanism at its disposal, the General Assembly expressly provides for such mechanism by statute."

344 Md. at 16, 684 A.2d at 844. Because no provision in Article 2B granted the Board the power to restrict an establishment's hours of operation as a means to enforce the Board's Rules, we held that the General Assembly did not intend that the Board be empowered to do so. *Hollywood Productions,* 344 Md. at 14–15, 684 A.2d at 843–844.

The statutory scheme under which the Board acts lent further support to our conclusion that the Board exceeded its authority. The General Assembly statutorily mandated the hours during which alcoholic beverages may be sold in Maryland, and the Board was given no power to alter those hours. *Hollywood Productions,* 344 Md. at 16, 684 A.2d at 844. Furthermore, we explained:

"Article 2B precisely establishes the sanctions available to a liquor board in responding to a licensee's misconduct. Such an elaborate statutory scheme suggests a specific, rather than broad, delegation of authority to the liquor boards and contradicts the notion that restrictions, penalties, and sanctions may be fashioned on an *ad hoc* basis."

*Hollywood Productions,* 344 Md. at 16, 684 A.2d at 844. The actions that a Board may properly take under Article 2B to punish licensee misconduct include: impose a monetary fine,

suspend a license, and revoke a license. *Hollywood Productions,* 344 Md. at 15, 684 A.2d at 844.

That the Board exceeded the scope of its authority in the instant case is evidenced by both the intent of the General Assembly in empowering the Board and by Article 2B. As we stated in *Hollywood Productions,* it is reasonable to infer that the General Assembly did not intend the Board to have the power to place restrictions on a license as an enforcement mechanism, because it did not so state in Article 2B. Furthermore, the General Assembly did precisely enumerate the sanctions that the Board has the power to impose in Article 2B. *Hollywood Productions,* 344 Md. at 16, 684 A.2d at 844. We hold that the Board exceeded its authority by imposing restrictions on the Licensees' license as a sanction and that the restrictions imposed are of no effect.

## IV.

Where a licensee consents to having a restriction placed upon his or her license, however, a different result may be reached. The license under which the Licensees have been operating their establishment for nearly three years was transferred to the Licensees only after they convinced the Board that they intended to operate a restaurant and not a bar. As a display of their good faith, the Licensees suggested that the Board incorporate, as a restriction on the license, the agreement that the Licensees had entered into with the FPHA. The Board did so.

The Licensees now argue that the Board has no power to place restrictions on an individual license. Today we hold that the Board may place restrictions on a license with the consent of the licensee. The Board may not, however, coerce a prospective licensee's consent by improper means. If a licensee feels aggrieved by the conditions sought to be placed on his or her license, he or she should seek judicial review at the time the conditions are imposed.

In this case, however, the Licensees did not seek judicial review at the time the original restrictions were imposed.

Rather, the original restrictions were imposed at the Licensees' request. Furthermore, it is reasonable to assume that the license would not have been transferred absent the agreement to the restrictions. The agreement said that it was to be attached to the license for as long as it covered the property at 723 South Broadway. The face of the license itself stated that the licensee must operate in line with the conditions set forth in the agreement with the FPHA. Finally, Licensee Justin Walters explicitly advised the Board that the Licensees would "absolutely" "operate this location to the letter of this agreement," and Licensees Christopher Francis and Thomas Hicks explicitly agreed to substantially the same terms. The Licensees have enjoyed the benefits of this license since November 4, 1993.

Several cases have explained that it would be inequitable to allow a party who has accepted and retained the advantages of an agreement to attack the validity or propriety of the conditions to which the agreement was subject. For example, in *Montgomery County v. Mossburg*, 228 Md. 555, 557, 180 A.2d 851, 852 (1962), the Board of Appeals for Montgomery County granted Mossburg a special exception to expand his existing non-conforming restaurant use with a light wine and beer license, subject to various conditions. Mossburg immediately sought judicial review of the imposition of the conditions. This Court held that Mossburg was not bound to accept the conditions; he could choose to forego the special exception altogether. *Mossburg*, 228 Md. at 560, 180 A.2d at 854. We did say, however, that "[i]f he decides to accept a conditioned exception, it would appear that he would not thereafter be in a position to challenge the conditions, although we need not now decide the point." *Id.*

In *Zweifel Manufacturing Corp. v. City of Peoria*, 11 Ill.2d 489, 144 N.E.2d 593 (1957), a case we cited in *Mossburg*, Zweifel sued the city of Peoria and sought a judgment that would declare invalid certain conditions imposed by the zoning board of appeals in granting a variance. Zweifel had agreed to the conditions in order to obtain a zoning variance which would allow it to construct a building and to utilize a portion of

the area behind the building for parking. *Zweifel,* 144 N.E.2d at 595. The Supreme Court of Illinois held that Zweifel was in no position to complain later about the conditions. *Id.* Without the variation, Zweifel would have had no right to construct the building in the manner desired or to utilize a portion of the area behind the building for parking. *Id.* Also, the court explained, Zweifel did not pursue any remedy of review; it "instead accepted the benefits granted to [it] by the terms of the variation[ ]." *Id.* The court concluded that "[b]y accepting the advantages of the variation [Zweifel] . . . waived whatever error may have existed in imposing the conditions upon which the variation was granted." *Id.* (citations omitted).

In *Charles Simon's Sons Co. v. Md. Tel. Co.,* 99 Md. 141, 163, 57 A. 193, 194 (1904), Maryland Telephone and Telegraph Co., a public utility company, accepted a franchise which enabled it to run its telephone and telegraph lines under, upon or over the "streets, alleys, conduits and other public places" of Baltimore City. As a condition of the franchise, the company agreed to adhere to an ordinance which set maximum rates for telephone service. *Simon's,* 99 Md. at 164–65, 57 A. at 194. The company later challenged the reasonableness of the rates set forth in the ordinance. *See Simon's,* 99 Md. at 177, 57 A. at 199. This Court noted that the company had the right to refuse the rates set in the ordinance at the time of its passage, and we held:

> "It cannot be here objected by [Maryland Telephone] that the regulation contained in the ordinance . . . as to rates of charge was not a reasonable one. The time to have urged such a consideration was before it accepted the ordinance and availed of the privileges it acquired thereunder."

*Simon's,* 99 Md. at 177, 57 A. at 199.

In *Federal Power Com. v. Colorado Gas Co.,* 348 U.S. 492, 499, 75 S.Ct. 467, 471, 99 L.Ed. 583, 592 (1955), the Supreme Court of the United States held that the United States Court of Appeals for the Tenth Circuit could not invalidate an existing order of the Federal Power Commission ("Commis-

sion") *sua sponte.* The order was proposed by the Colorado Interstate Gas Co. ("Colorado") in order to convince the Commission to allow Colorado to merge with another company. *Federal Power,* 348 U.S. at 494, 75 S.Ct. at 469, 99 L.Ed. at 589–90. The Commission would likely have refused to certify the merger if it were not for the conditions, proposed by Colorado, that were agreed to by both parties and that were formalized in an order of the Commission. *Federal Power,* 348 U.S. at 502, 75 S.Ct. at 473, 99 L.Ed. at 593. Colorado consummated the merger and enjoyed its benefits for several years. *Federal Power,* 348 U.S. at 502, 75 S.Ct. at 473, 99 L.Ed. at 593–94.

Colorado and the Commission later entered into litigation concerning the application of the conditions, and the Tenth Circuit reversed the Commission's order *sua sponte.* *Federal Power,* 348 U.S. at 496, 75 S.Ct. at 470, 99 L.Ed. at 591. Before the Supreme Court, Colorado argued that nothing should prevent the Tenth Circuit from attacking the validity of the order *sua sponte.* *Federal Power,* 348 U.S. at 498, 75 S.Ct. at 471, 99 L.Ed. at 591. Although the case was primarily decided on another theory, the Supreme Court said:

> "In 1950, [Colorado] proposed this condition in its merger proceeding. * * * In 1951, the condition before us became an important factor in securing the Commission's finding that the merger would be in the public interest. After the merger was approved on that condition, [Colorado] sought no review of it. On the other hand, respondent consummated the merger and has enjoyed its benefits ever since. It cannot now be allowed to attack an officially approved condition of the merger while retaining at the same time all of its benefits." (Citations omitted).

*Federal Power,* 348 U.S. at 501–02, 75 S.Ct. at 473, 99 L.Ed. at 593–94.

The sequence of events in this case is similar to the sequence of events in *Federal Power.* The Licensees proposed that the agreement be incorporated into the license as a restriction at its hearing before the Board. The Licensees'

promise to conduct business in accordance with the agreement was a significant factor in favor of the Board's decision to transfer the license. The Licensees sought no review of the Board's decision. Rather, the Licensees have been operating a business and enjoying the benefits of the license for over two years. We cannot allow the Licensees to whipsaw the Board by claiming that the Board may not enforce the very agreement that the Licensees proposed and that the Board relied on because the Board had no power to accept the Licensees' offer in the first instance.

This is not to say that the Board may use its power to grant or transfer a license to try to coerce the acceptance of restrictions by the prospective licensee or that all restrictions agreed to by licensees are valid; these are issues to be decided another day. In the instant case there is no contention that the Licensees' agreement to the restrictions was anything less than free and voluntary; indeed the restrictions were proposed by the Licensees. Therefore, the Licensees did not seek judicial review at the time the restrictions were imposed. Today we hold that when a licensee agrees to reasonable restrictions in order to obtain a license that clearly would not otherwise be granted, the licensee will be estopped from later arguing that the Board had no power to place such a restriction on the license. Neither the reasonableness nor the voluntariness of the initial restrictions is at issue, and we affirm the Board's authority to adopt the initial, consented to restrictions.

The second set of restrictions were not consented to, however, but were imposed as a sanction. As to these restrictions, *Hollywood Productions, supra*, controls our decision. The Board may not impose unconsented to restrictions on a license unless expressly or impliedly authorized by Article 2B. We therefore declare invalid those restrictions that were imposed as a sanction.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT*

**142**

*FOR BALTIMORE CITY FOR FURTHER PROCEED-INGS. COSTS TO BE PAID BY THE APPELLEE.*