731 A.2d 948

**EXXON COMPANY, U.S.A.**

v.

**STATE HIGHWAY ADMINISTRATION OF the MARYLAND DEPARTMENT OF TRANSPORTATION.**

No. 142, Sept. Term, 1998.

Court of Appeals of Maryland.

June 16, 1999.

Marta D. Harting and Kurt J. Fischer (Piper & Marbury, L.L.P., on brief), Baltimore, for Appellant.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, on brief), Baltimore, for Appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

This case presents a constitutional challenge to a condition included in a special exception for the remodeling of a gasoline filling station and in a permit to construct facilities within a planned right-of-way. We do not reach the constitutional issue, however, because the challenge should have been made when the allegedly unconstitutional condition was imposed and because the challenger acquiesced in the condition of which it now complains.

## I

In 1962 the predecessor of the appellant, Exxon Company, U.S.A. (Exxon), leased for twenty years approximately 21,971 square feet of land located on the northwest corner of Allentown Road and Old Branch Avenue, Camp Springs, Prince George's County, Maryland (the Property) on which to construct and operate a gasoline service station.[1] The lease provided that all "structures, tanks, machinery, equipment and all other property ... placed upon the premises, whether annexed to the freehold or not, shall remain the personal property of Lessee[.]" A special exception (No. 751) for the operation of a service station on the Property was granted in March 1962 by the County Council for Prince George's County, sitting as the District Council.[2] It was apparently as part of the initial construction that underground gasoline storage tanks were placed along the Allentown Road side of the Property, near the intersection.

In April 1977 the appellee, the State Highway Administration of the Maryland Department of Transportation (SHA), purchased eight to ten feet of the Allentown Road frontage of the Property from the lessors, with Exxon's consent, for a widening of that road. Allentown Road was shown in the

---

1. Throughout the record Allentown Road is treated as running east and west and Old Branch Avenue as running north and south.

2. No part of the 1962 special exception proceedings has been included in the record.

master plan as ultimately being widened to a 120 foot right-of-way which would then require taking twenty-two feet of the Property's frontage on that road.

The lease was extended to December 31, 1991, and Exxon was given the option of extending the lease an additional six years to December 31, 1997.

On October 14, 1981, Exxon applied to the District Council for a special exception (No. 3308). The purpose of the request was to modernize the existing gasoline station. Included in the planned remodeling were replacing the existing underground tanks, adding a third pump island, and adding a canopy over all of the pump islands. The new pump island and part of the new canopy, as well as the replacement underground tanks, would be within the planned right-of-way of the future widening of Allentown Road. The Technical Staff recommended approval in a report that contained the following in its "Comments" section:

> "There are no immediate plans to widen the roads abutting the subject property. The Transportation Planning Division staff . . . indicated that the pump island within the right-of-way would not have any adverse effect on the circulation system within the area. If the District Council approves the request to build within the right-of-way it is recommended that the approval be conditioned to the removal of any structures or equipment be solely [*sic*] the economic responsibility of the owners when the road is widened."

At the public hearing before the Prince George's County Zoning Hearing Examiner, counsel for Exxon stated:

> "With regard to the Technical Staff Report and the staff's recommendation, with the exception of condition number one [regarding landscaping between the street and parking areas], which we will get into later, we concur and adopt what the staff has recommended."

At that hearing John Warren (Warren), the marketing representative for Exxon in Prince George's County, testified as follows:

"Q. Mr. Warren, were you in the room when Mr. [Derro,[3] Chief of the Transportation Division of the Prince George's County Planning Board] testified earlier as to the status of the widening of Allentown Road?

"A. Yes.

"Q. Were the comments that Mr. [Derro] gave in accordance with what your understanding was as to the ... proposed widening of Allentown Road?

"A. Yes.

"Q. If the building permit were granted by virtue of the County Council permitting us to build within half of this widening aspect of Allentown Road, are you able to represent that the removal of the pump island that is located within that proposed widening area as well as the portion of the canopy that extends over would be removed by Exxon at its expense?

"A. By Exxon at Exxon's expense, yes."

Warren summed up by testifying:

"Q. If I understood the answer to your last question, Mr. Warren, essentially what you are saying is that Exxon is doing this because, A, it wants to modernize the station and, B, it really doesn't have any expectation that Allentown Road is going to be relocated in the near future to affect the modernization, isn't that right?

"A. Yes, sir.

"Q. That's what I thought. Okay."

The Zoning Hearing Examiner recommended approval of the special exception, subject to certain conditions, including:

"3. The applicant shall remove at its own expense, all structures and fixtures that are located on or in any part of the subject property taken or acquired by a public body, corporation or agency for the improvement or widening of Allentown Road."

---

3. This person's name is spelled both "Darrow" and "Derro" in the hearing transcript. We use the spelling employed in the transcript of the individual's testimony.

Related to this condition, the Zoning Hearing Examiner's sixth finding of fact, after referring to the future taking of twenty-two feet, stated:

"The proposed outside pump island is approximately 12 feet, on center, from the existing property line and the proposed canopy extends to the existing property line along Allentown Road. The underground tanks are also located in the proposed right-of-way, in the south corner of the lot, near the intersection. There are presently no funds in any budget, nor any plans, except for the Master Plan, to widen Allentown Road. In the opinion of the Transportation Division of [the] Maryland–National Capital Park and Planning Commission, it will probably be longer than 10 years before anything is done to accomplish the widening. The applicant has agreed to remove, at its own expense, all structures, fixtures, etc., located in the right-of-way on this property, upon the widening of Allentown Road. (T.24)"

On May 10, 1982, the District Council enacted Zoning Ordinance No. 24–1982, which granted the special exception and granted Exxon's request for permission to construct facilities for its filling station within the planned right-of-way for the widening of Allentown Road, subject to the condition recommended by the Zoning Hearing Examiner, namely,

"3. The applicant shall remove, at its expense, all structures and fixtures that are located on or in any part of the subject property which is taken or acquired by a public body, corporation, or agency for the improvement or widening of Allentown Road."

Thereafter, until the proceedings that are now before this Court, Exxon did not challenge this zoning ordinance or the quoted condition.

In October 1994, by a "quick take" condemnation, the SHA acquired in fee simple approximately 5,382 square feet of the Property across the frontage on Allentown Road and along Old Branch Avenue, for the widening of Allentown Road and of Old Branch Avenue. As a result, Exxon was required to remove all of its fixtures, equipment, and improvements from

the area of acquisition. In doing so Exxon incurred $166,300 in relocation costs, consisting of $15,900 for the removal of the underground tanks, $14,600 for the removal of and resulting repairs to Exxon's canopy and gasoline pumps, $38,600 for the purchase of replacement tanks, and $97,200 for the installation of replacement tanks in the remaining area of the station.

Exxon submitted to the SHA a claim for $166,300 in relocation assistance pursuant to Maryland Code (1974, 1996 Repl. Vol.), § 12–205(a) of the Real Property Article (RP).[4] In October 1996 the Relocation Assistance Division of the SHA denied Exxon's claim on the ground that "there is no eligibility for relocation assistance payments due to the zoning ordinance No. 24–1982 of [the] Prince George's County Council dated May 10, 1982."

## II

Exxon appealed the Relocation Assistance Division's denial of its claim to the SHA's Office of Real Estate. In its appeal, Exxon argued that "the requirement in the Ordinance which purports to prohibit Exxon from recovering compensation for its relocation expenses is unconstitutional," stating that "[t]he sole purpose and effect of [the] requirement in the Ordinance ... is to diminish or freeze the amount of compensation to which Exxon would be entitled as a result of the taking of its property to widen Allentown Road."

At the hearing Exxon apparently also claimed that it would not have agreed to the condition in 1982 had it known that the

---

4. Section 12–205(a), in relevant part, reads:

"(a) *Generally.*—Whenever a program or project undertaken by a displacing agency will result in the displacement of any person, the displacing agency shall make a payment to the displaced person, on proper application as approved by the displacing agency for:

"(1) Actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;

"(2) Actual direct loss of tangible personal property as a result of moving or discontinuing a business or farm operation, but not exceeding an amount equal to the reasonable expenses that would have been required to relocate the personal property, as determined by the agency[.]"

SHA would be acquiring property fronting both Allentown Road and Old Branch Avenue.[5] Based on the earlier quoted provision in the lease, Exxon further claimed that the expenses were eligible for payment under RP § 12–205 because the relocation involved personal property.

The SHA's Office of Real Estate affirmed the Relocation Assistance Division's denial of Exxon's claim on the rationale set forth below:

> "In point of fact, Exxon in 1982 agreed to take the risk of locating its property within the known future right-of-way of Allentown Road in exchange for being allowed to expand the Gas Station. That right-of-way expansion has, in fact, occurred. Exxon also could have conditioned its agreement upon the magnitude or extent of any future acquisition, but it did not.... Accordingly, Exxon cannot now renege on its agreement because the acquisition that now has occurred is larger than the one it claims it foresaw in 1982."

As an additional ground of decision the SHA concluded that "the property for which Exxon argues it is entitled to relocation payment comprises fixtures, not personal property." The SHA stated that, despite the language in the lease defining the property owned by Exxon as personal property, such property "cannot be removed from the land without causing material damage to either the real estate or themselves," and the property was fixtures. As realty, and not personalty, such property did not meet "the criteria for personal property pursuant to the Relocation Assistance Program."

Exxon petitioned the Circuit Court for Prince George's County for judicial review of the SHA's final decision. That court upheld the SHA's decision, concluding that the ordinance was not unconstitutional and that Exxon failed to challenge the ordinance when it was enacted. On the latter aspect the circuit court said:

---

5. The transcript, if any, of the hearing before the Office of Real Estate has not been included in the record.

"The Zoning Hearing Examiner determined that the appellant agreed to the conditions of this Special Exception. There were no appeals from the Zoning Hearing Examiner's findings. Those findings cannot now, in the first instance, be the basis for a challenge to the validity of the Special Exception."

The court further held that there was substantial evidence to support the SHA's alternative determination, namely, that the property within the area of acquisition was realty and not personalty.

Exxon appealed to the Court of Special Appeals. Prior to the consideration of the appeal by the Court of Special Appeals, this Court issued a writ of certiorari on its own motion.

The following questions are presented for review:

"1. Is Exxon barred from recovering relocation assistance for its relocation costs resulting from a taking of its property by the SHA under a special exception which purports to prohibit Exxon from recovering relocation assistance for items within a planned right of way as a condition to granting the special exception?

"2. Did the SHA err as a matter of law in concluding that Exxon's relocation assistance claim related to non-compensable real property rather than personal property?"

### III

This Court has stated that "[i]t has long been held and is firmly established that it is not only proper but desirable to attach to the grant of a special exception conditions which do not violate or go beyond the law and are appropriate and reasonable." *Montgomery County v. Mossburg,* 228 Md. 555, 558, 180 A.2d 851, 852 (1962). But, this Court has also stated that local zoning bodies "cannot use zoning to depress land values so as to reduce the damages paid by the sovereign when it otherwise validly invokes its power to condemn." *Mayor of Baltimore v. Kelso Corp.,* 281 Md. 514, 520, 380 A.2d 216, 220 (1977). *Accord Hoyert v. Board of County Comm'rs,* 262 Md. 667, 674, 278 A.2d 588, 591 (1971); *Carl M. Freeman*

*Assocs. v. State Roads Comm'n,* 252 Md. 319, 329–30, 250 A.2d 250, 255 (1969).

*Congressional School of Aeronautics, Inc. v. State Roads Comm'n,* 218 Md. 236, 146 A.2d 558 (1958), summarizes that

"[t]here seems to be general agreement among the authorities which have considered the question that zoning cannot be used as a substitute for eminent domain proceedings so as to defeat the constitutional requirement for the payment of just compensation in the case of a taking of private property for public use by depressing values and so reducing the amount of damages to be paid."

*Id.* at 241, 146 A.2d at 560–61. *See also* 4 E.H. Ziegler, Jr., *Rathkopf's The Law of Zoning and Planning* § 52.02[1], at 52–11 to 52–13 (4th ed. Mar.1999 release) ("In regard to eminent domain proceedings, courts long have recognized that a zoning restriction goes 'too far' and constitutes a regulatory taking for which compensation must be paid when the restriction is enacted primarily for the purpose of depressing the market value of the land prior to the land's condemnation or for the purpose of subjecting property to a public use without the necessity of condemnation. Similarly, courts have held that it is constitutionally impermissible to deny a rezoning which is otherwise warranted merely because the property might eventually be condemned for a public use or to deny other zoning approvals on that ground.") (footnotes omitted).

■ The aggrieved property owner, however, ordinarily must directly challenge an alleged constitutionally invalid zoning ordinance by seeking judicial review at the time the ordinance is enacted, if there is an opportunity to do so, and not by collateral attack in a subsequent condemnation proceeding. This was the conclusion that this Court reached in *Congressional School of Aeronautics,* 218 Md. 236, 146 A.2d 558. That case involved property located within a proposed highway widening. The property had been zoned residential and was adjacent to property zoned commercial and light industrial; consequently, the value of the property zoned residential was half that of the adjacent areas. *Id.* at 239–40,

146 A.2d at 559–60. During the condemnation proceedings in the circuit court, the owner attempted to attack the validity of the ordinance zoning the property as residential by requesting an instruction that

> "if the jury should find that the 'zoning authority' restricted the zoning of the land taken to residential use in order that it might be acquired for highway use at a lower price, the jury should disregard this 'restrictive zoning.' The [owner] also sought a binding instruction to like effect."

*Id.* at 243–44, 146 A.2d at 562. The circuit court refused both instructions.

On appeal to this Court two of the issues raised were: "First, was the zoning of the strip in question as residential invalid as amounting to a taking of property without payment of just compensation? Second, if so, was the zoning of that property open to attack in this proceeding?" *Id.* at 240, 146 A.2d at 560. The Court stated that the first question was "not so presented as to require its determination," *id.* at 242, 146 A.2d at 561, but the Court addressed the second issue. A review of cases in which courts considered the validity of zoning ordinances revealed that they "were all cases of direct attack," *id.* at 247, 146 A.2d at 564, and that "[n]o authority in this country has been brought or has come to our attention which sanctions a collateral attack in a condemnation suit on the validity of a zoning ordinance as applied to the property sought to be condemned." *Id.* at 248, 146 A.2d at 564–65.

The Court stated that although there was no statutory provision for judicial review of the zoning ordinance, the owner could have sought a " 'bill in equity to enjoin enforcement of the action alleged to be unconstitutional or (in the case of administrative action) arbitrary or otherwise illegal.' " *Id.* at 243, 146 A.2d at 562 (quoting *Bogley v. Barber,* 194 Md. 632, 640, 72 A.2d 17, 20 (1950)). "No explanation is offered for the [owner's] not having sought such a remedy." *Id.* Accordingly, the Court said that

> "a collateral attack is not permissible, at least where, as in the instant case, a direct proceeding to challenge the validi-

ty of the classification, with the zoning authority as a party, was readily available. Both of the [owner's] prayers based upon the alleged invalidity of the ordinance as applied to its property were properly rejected."

*Id.* at 248, 146 A.2d at 565.

A decade later, this Court permitted a collateral attack in a condemnation proceeding on a previously enacted zoning ordinance but only after carefully distinguishing the facts in that case from those in *Congressional School of Aeronautics. Carl M. Freeman Assocs.*, 252 Md. 319, 250 A.2d 250. In *Freeman* a district council, on application of a prior owner for upzoning of the subject property and the land surrounding it, had rezoned the surrounding land from residential-agricultural to commercial-apartment, but, pursuant to a local ordinance, the council had refused to rezone the subject property because it had been proposed for highway use on a master plan. *Id.* at 321, 250 A.2d at 250–51. The owner objected to evidence offered by the condemnor, arguing that valuing the property under the residential-agricultural zoning constituted a taking without just compensation. *Id.* at 324, 250 A.2d at 252.

The Court recognized that permitting a challenge to the zoning classification during the condemnation proceeding "leads into the question of whether there can be a collateral attack upon the ordinance which may appear contrary to the view expressed by this Court in *Congressional School v. State Roads Commission." Freeman*, 252 Md. at 324, 250 A.2d at 252. *Congressional School of Aeronautics* was distinguished. In *Freeman* the zoning authority was a party to the proceeding. More important, the condemnee did not own the property "at the time it was impressed with" the residential-agricultural zoning and, therefore, "did not have at that time the requisite standing to mount a direct legal attack on the validity of the ordinance." 252 Md. at 326, 250 A.2d at 254. The Court found that these differences, "although slight, are none the less significant." *Id.*

In the instant matter Exxon not only required a special exception because it sought to enlarge a gasoline filling sta-

tion, see Prince George's County Zoning Ordinance §§ 27–322(a), 27–323 (1995), but it also required a permit to build in the proposed right-of-way. *Id.* § 27–259(a)(1).[6] With respect to the latter restraint the Court in *Freeman* said:

> "[W]e think it significant that Article 66B (1967 Repl.Vol.) of the Maryland Code entitled 'Zoning and Planning,' which while providing in sections 31 and 32 for the reservation of the land for proposed streets and highways for future public acquisition, seeks to implement this objective by controlling the issuance of building permits in the bed of the dedicated street or highway and makes no mention of reserving a proposed street bed through the expedient of zoning.... One may see the reason for controlling the issuance of building permits in the area to be used in the reasonably foreseeable future for street or highway purposes, so that additional costs, not affecting the value of the land itself, will not be incurred. However, the control of the issuance of building permits does not have the effect of denying to the property owner the right to introduce into evidence testimony as to the value of the land based on its highest and best use within the framework of the zoning classification of the property of which the street bed is a part."

252 Md. at 330, 250 A.2d at 256.

Courts in other jurisdictions generally have not permitted a collateral attack on a zoning ordinance during a condemnation proceeding when there had been an opportunity directly to attack the zoning ordinance. *See, e.g., Robinson v. Commonwealth,* 335 Mass. 630, 631–32, 141 N.E.2d 727, 728 (1957) (overruling a property owner's exceptions to the exclusion of evidence that his property had a greater value but for allegedly invalid zoning ordinances; "The petitioner had ample opportunity to attack directly the ordinance if he had desired to

---

**6.** Prince George's County Zoning Ordinance § 27–259(a)(1) reads in relevant part that

"no building or sign permit ... may generally be issued for any structure on land located within the right-of-way or acquisition lines of a ... proposed relocation or widening of an existing street ... as shown on a Master Plan[.]"

do so. He could have filed a petition in the Land Court, or he could have filed a suit for declaratory relief in the Superior Court to determine the validity of the ordinances; but in our opinion he could not at the trial of the petition for land damages against the Commonwealth attack the zoning ordinances") (citations omitted); *see also* 4 *Nichols on Eminent Domain* § 12C.03[1], at 12C–73 (rev.3d ed. June 1998 release) ("It has been held that the owner cannot, in the condemnation proceeding, attack the validity of a zoning ordinance where ample opportunity for direct attack existed prior thereto."); 4 Ziegler, *supra*, § 52.02[2][a], at 52–15 to 52–16 ("Where the zoning restriction in question, however, has not already been adjudicated invalid at the time of the taking by condemnation, courts in a number of cases have disallowed actual adjudication of the restriction's validity by collateral attack in an eminent domain proceeding. While the case law on point is not entirely clear, courts that have expressly addressed this question have typically ruled that actual adjudication of the validity of a zoning restriction by collateral attack will not be permitted in an eminent domain proceeding at least where the owner had ample opportunity earlier to directly challenge the validity of the restriction.") (footnote omitted); *cf. United States v. 319.88 Acres of Land,* 498 F.Supp. 763, 767 (D.Nev.1980) (allowing a collateral attack on a federal zoning regulation during a condemnation action on the ground that the property owner and also the government itself were unaware of the regulation; "Therefore, it can hardly be argued that the property owner had ample prior opportunity to challenge the regulation directly"); *State ex rel. Missouri Highway & Transp. Comm'n v. Sturmfels Farm Ltd. Partnership,* 795 S.W.2d 581, 587 (Mo.Ct.App.1990) (allowing a collateral attack on contract rezoning requirements in zoning ordinances during a condemnation proceeding because the ordinances were enacted after the property was condemned and, therefore, there was no prior opportunity for a direct attack).

Some courts have permitted a collateral attack in cases where the condemnor is also the zoning authority. *See, e.g.,*

*People by Dep't of Pub. Works v. Southern Pac. Transp. Co.,* 33 Cal.App.3d 960, 966, 109 Cal.Rptr. 525, 529 (1973) ("It is practical and logical to require that such invalid zoning be disregarded [in valuation] where the zoning authority is also the condemnor. Permitting recovery in eminent domain disregarding the zoning restriction combines in one action the right to recover compensation for both the inverse condemnation resulting from the disguised taking in the form of zoning and for the actual taking of the property. . . . Moreover, the condemning authority is also the zoning government so that much of the vice of a collateral attack on zoning in the usual eminent domain proceeding is not present."); *Department of Pub. Works & Bldgs. v. Exchange Nat'l Bank,* 31 Ill.App.3d 88, 98, 334 N.E.2d 810, 818 (1975) ("Although in most situations a collateral attack upon zoning is not permitted in an eminent domain proceeding, that principle is inapplicable to the situation where the condemnor purporting to exercise its police power by enacting a zoning ordinance has in reality discriminated against a particular parcel or parcels of land in order to depress their value with a view to future takings in eminent domain. In such a situation such action has been vigorously condemned as confiscatory and the condemnee may attack the validity of the zoning ordinance in the eminent domain action and if successful require that his property be valued free of its restrictions.") (citations omitted); *see also* 4 *Nichols on Eminent Domain, supra,* § 12C.03[1], at 12C–73 ("It has been held, however, that the prohibition of collateral attack does not apply in a situation where the condemnor and the zoning authority are identical."); 4 Ziegler, *supra,* § 52.02[2][a], at 52–16 (same).

In this case, Exxon could have challenged directly the validity of the condition inserted in the special exception and building permit under the review permitted by then Article 66D of the Maryland Code (1957, 1978 Repl.Vol., 1982 Cum. Supp.) (now codified in Article 28 of the Maryland Code (1957, 1997 Repl.Vol., 1998 Cum.Supp.)). This Exxon did not do.

In addition Exxon has acquiesced in the condition that it pay the relocation expenses. This issue is similar to that in

*Board of Liquor License Comm'rs v. Fells Point Cafe, Inc.,*
344 Md. 120, 685 A.2d 772 (1996). In that case, prospective
liquor licensees sought to have ownership of a liquor license
transferred to them. During the license transfer proceedings,
the licensees entered into an agreement with a community
association opposing the transfer, in which the licensees
agreed to certain conditions related to the operation of a
restaurant. During the license transfer hearing before the
Board of Liquor License Commissioners for Baltimore City,
the licensees requested the board to incorporate the agree-
ment into the license as a restriction on the license. *Id.* at
123, 685 A.2d at 773.

Later, during a hearing to determine whether the licensees
violated the terms of the incorporated agreement, the licen-
sees argued that the board could not enforce the agreement
against them because it had no power to place restrictions on
an individual license. *Id.* at 124, 685 A.2d at 774. The board
concluded that it did have such authority and found that
violations had occurred.

This Court held that, although the board had no authority
unilaterally to impose the restrictions in the agreement on the
license, the board could impose restrictions to which the
licensees freely consented. *Id.* at 137, 685 A.2d at 780. It
was the licensees' suggestion that the board incorporate the
agreement into the license as a display of good faith to operate
a restaurant and not a bar or nightclub. Upholding the
voluntary restrictions, the Court emphasized that the licensees
failed to seek judicial review of the restrictions and instead
accepted the benefits of the license. *Id.* at 137–38, 685 A.2d at
780.

After reviewing several cases explaining "that it would be
inequitable to allow a party who has accepted and retained the
advantages of an agreement to attack the validity or propriety
of the conditions to which the agreement was subject," *id.* at
138, 685 A.2d at 781, we held that "when a licensee agrees to
reasonable restrictions in order to obtain a license that clearly
would not otherwise be granted, the licensee will be estopped

from later arguing that the Board had no power to place such a restriction on the license." *Id.* at 141, 685 A.2d at 782. As the Court explained:

"The Licensees proposed that the agreement be incorporated into the license as a restriction at its hearing before the Board. The Licensees' promise to conduct business in accordance with the agreement was a significant factor in favor of the Board's decision to transfer the license. The Licensees sought no review of the Board's decision. Rather, the Licensees have been operating a business and enjoying the benefits of the license for over two years. We cannot allow the Licensees to whipsaw the Board by claiming that the Board may not enforce the very agreement that the Licensees proposed and that the Board relied on because the Board had no power to accept the Licensees' offer in the first instance."

*Id.* at 140–41, 685 A.2d at 782.

*See also Skipjack Cove Marina, Inc. v. County Comm'rs,* 252 Md. 440, 250 A.2d 260 (1969) (current property owners could not attack in a collateral proceeding the conditions that their predecessors in title accepted with a special exception and did not challenge in a judicial review of the board's decision). *Accord In re Rosedale Avenue,* 40 Misc.2d 1076, 1079, 243 N.Y.S.2d 814, 817–18 (1963); *Marvin E. Nieberg Real Estate Co. v. St. Louis County,* 488 S.W.2d 626, 630–31 (Mo.1973).

In this case, as stated in the findings of the Zoning Hearing Examiner, Exxon agreed to the condition contained in the ordinance. As pointed out by the SHA, "[a]s a result of its agreement to that condition, the County permitted Exxon to do what Exxon was originally told it could not do, *i.e.,* modernize and expand its filling station, thus enabling Exxon to service more cars, sell more gasoline, and otherwise increase its revenues and business opportunities."

■ For all of the foregoing reasons Exxon may not now attack the validity of the condition, and, under the presumption of constitutionality, the ordinance stands. Inasmuch as

we sustain the decision of the SHA on the first ground assigned by that agency, it is unnecessary to consider Exxon's arguments directed against the second ground given by the SHA to support its decision.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**